(Nos. 39983, 39984 cons.—

THE CITY OF CHICAGO, Appellee, *vs.* DICK GREGORY *et al.*,
Appellants.

*Opinion filed January 19, 1968.*

WARD, J., took no part.

MARSHALL PATNER and PAUL E. GOLDSTEIN, both of
Chicago, for appellants.

RAYMOND F. SIMON, Corporation Counsel, of Chicago,
(SYDNEY R. DREBIN and HOWARD C. GOLDMAN, Assistants
Corporation Counsel, of counsel,) for appellee.

Mr. JUSTICE HOUSE delivered the opinion of the court:

These consolidated appeals involve the conviction of 40 civil rights marchers under two provisions of the disorderly conduct ordinance of the city of Chicago. (Municipal Code of Chicago, sec. 193—1.) In cause number 39983 defendant Dick Gregory and four other defendants were found guilty in a jury trial before a magistrate in the circuit court of Cook County and each defendant was fined $200. In cause number 39984 the other 35 defendants were found guilty in a trial before a magistrate on a stipulation of facts adduced at the Gregory trial and each defendant was fined $25. The defendant Gregory was charged with disorderly conduct in that he "did make or aid in making an improper noise, disturbance, breach of peace, or diversion tending to a breach of the peace within the limits of the city." A constitutional question gives us jurisdiction.

The gist of the occurrence giving rise to the arrest and conviction of defendants was a march by 65 to 85 persons around the home of the mayor of Chicago. The marchers carried signs, sang songs and chanted slogans protesting the retention of Dr. Benjamin C. Willis as Superintendent of Schools of Chicago and his handling of school segregation problems in the city. In order to avert what the police believed would become a riot, the marchers were ordered to stop their demonstration and upon their refusal they were arrested.

The city in its brief has taken the position that residential picketing is *per se* a violation of the city ordinance. Extremely strong arguments have been advanced for the proposition that the constitutional rights of free speech, free assembly and freedom to petition for redress of grievances do not protect marches, demonstrations and picketing of a residence or residences—even of the privately owned homes of public officials. (See Kamin, Residential Picketing and the First Amendment, 61 N.W. L. Rev. 177 (1966); *Cf.* Chafee, Free Speech in the United States (Cambridge, 1948), pp. 406-407; Pritchett, The Brief, p. 4 (published

by the Illinois Division of American Civil Liberties Union, September 1965); but see Haiman, The Rhetoric of the Streets: Some Legal and Ethical Considerations, LIII The Law Quarterly Journal of Speech 99 (April 1966); Kalven, The Concept of the Public Forum, 1965 Supreme Court Review 1.) Furthermore, our legislature has now enacted a statute prohibiting residential picketing (Ill. Rev. Stat. 1967, chap. 38, par. 21.1—1) based on the following declaration of policy: "The Legislature finds and declares that men in a free society have the right to quiet enjoyment of their homes; that the stability of community and family life cannot be maintained unless the right to privacy and a sense of security and peace in the home are respected and encouraged; that residential picketing, however just the cause inspiring it, disrupts home, family and communal life; that residential picketing is inappropriate in our society where the jealously guarded rights of free speech and assembly have always been asssociated with respect for the rights of others. For these reasons the Legislature finds this Article to be necessary." Professor Kamin in his article, Residential Picketing and the First Amendment, states that nine other States (Colorado, Connecticut, Florida, Hawaii, Kansas, Michigan, Nebraska, Utah and Wisconsin) have enacted statutory prohibitions of residential picketing. 61 N.W. L. Rev. 177, 206.

A review of the record shows, however, that the arrests were not made on the basis of residential picketing nor did the trial proceed on that theory. Under these circumstances, we will assume, for the purposes of this opinion, as did the police and the magistrates below, that the residential picketing was not in and of itself a violation of the city ordinance.

Lieutenant Hougeson testified that on August 2, 1965, he was in charge of the "task force" of the Chicago police department and that his assignment for that day was to protect a group of people who were going to march. He ex-

plained that the task force is a unit which provides extra police protection to a district to help handle crowds at a sporting or public event or to combat a high crime rate in a certain district. On this day he had 40 police officers and 4 sergeants. About 4:00 P.M. he went to Buckingham Fountain in Grant Park on Chicago's lake front just east of the Loop, where approximately 65 marchers had assembled. He observed Dick Gregory addressing the marchers and heard him say, "First we will go over to the snake pit [city hall]. When we leave there, we will go out to the snake's house [the mayor's home]. Then, we will continue to go out to Mayor Daley's home until he fires Ben Willis [Superintendent of Schools]."

About 4:30 P.M. the marchers, two abreast, walked out of the park and went to the city hall in the loop. The marchers then walked south on State Street to 35th Street and then proceeded west to Lowe Avenue, a distance of about 5 miles from the city hall. The mayor's home is at 3536 South Lowe Avenue. The demonstrators had increased in number to about 85 and they arrived at the mayor's home about 8:00 o'clock P.M. In addition to the police, the marchers were accompanied by their attorney and an assistant city counsel. At the suggestion of an assistant city counsel, Gregory had agreed that the group would quit singing at 8:30 P.M. Commander Pierson, district commander of the 9th police district which encompasses this area, met Lieutenant Hougeson at the corner of 35th and Lowe and assumed command of the police operations.

There were about 35 people on the corner and a group of about 6 or 8 youngsters carrying a sign "We Love Mayor Daley" tried to join the marchers but the police stopped them. As the demonstrators started south into the 3500 block of Lowe Avenue, Gregory testified he went back through the line to tell everyone just to keep singing and to keep marching. "Don't stop and don't answer any one back. Don't worry about anything that is going to be said

to you. Just keep marching. If anyone hits you or anything, try to remember what they look like, but above all means, do not hit them back. Keep the line straight and keep it tight." The demonstrators chanted "Ben Willis must go, Snake Daley, also;" "Ben Willis must go—When?—Now;" "We are going to the home of the snake, the snake pit is down the street;" "Hey, Hey, what do you know, Ben Willis must go" and "Hey, Hey, what do you know, Mayor Daley must go also." They carried signs which read: "Daley fire Willis;" "Defacto, Desmacto, it is still segregation;" "Ben Willis must go—now;" and "Mayor Daley, fire Ben Willis." They also sang the civil rights songs, "We Shall Overcome" and "We Shall Not Be Moved."

The police ordered the taverns closed during the march. Police from the task force, the 9th district and other districts surrounded the block in which the mayor's home is located. There were about 10 officers at each of the four intersections and about 10 officers spread along each of the four blocks. The rest of the 100 police officers assigned to the march accompanied the demonstrators as they marched around the block. The police tried to keep all spectators across the street from the marchers. They were equipped with walkie-talkie radios to relay reports of conditions to each other and they had a bullhorn with which they addressed the spectators and the demonstrators.

As the marchers started around the block the first time, the neighbors began coming out of their homes. On the second time around the block some of the residents had moved their lawn sprinklers onto the sidewalk and the demonstrators went into the street just long enough to get around the water. On the third trip around the block the water sprinklers had been removed, presumably by order of the police. Gregory himself testified to several instances when the police kept the crowd that was accumulating from interfering with the march. "One of the neighborhood people stood in front of the line, and we just stopped. This

individual didn't move and we didn't move. After a few minutes, the officer standing on the corner asked him to move and he moved." He said that on their fourth trip around the block (about 8:30 P.M.) people were yelling out the windows and the police made spectators in door ways close the doors. About 8:30 P.M. the demonstrators quit their singing and chanting and marched quietly. Shortly before 9:00 P.M. 100 to 150 spectators formed a line of march ahead of the demonstrators. Gregory said "the lieutenant [Hougheson] asked me if I would hold up the line until they got those people out of the way. I said, I will hold up the line, but they have just as much right to march peacefully as we have." The spectators were ordered to move. In order to avoid the appearance that the marchers were following the 100 to 150 spectators who had been ordered to move, Gregory said his group marched straight south crossing 36th Street thus taking them one block south of the block which they had been marching. They had to stop when they crossed 36th Street while the police opened a pathway through about 300 spectators they had confined on the corner across the street.

Sergeant Golden testified that between 8:00 o'clock and 9:00 o'clock the crowd increased steadily to a few hundred, but that from 9:00 o'clock until about 9:20 o'clock the people just seemed to come from everywhere until it reached between 1,000 and 1,200. During this time the crowd became unruly. There was shouting and threats, "God damned nigger, get the hell out of here;" "Get out of here niggers— go back where you belong or we will get you out of here" and "Get the hell out of here or we will break your blankety-blank head open." Cars were stopped in the streets with their horns blowing. There were Ku Klux Klan signs and there was singing of the Alabama Trooper song. Children in the crowd were playing various musical instruments such as a cymbal, trumpet and drum.

Rocks and eggs were also being thrown at the marchers

from the crowd. The police were dodging the rocks and eggs and attempted to catch the persons who threw them. Sergeant Golden explained the problem. "You could see these teen-agers behind the crowd. You could see a boil of activity and something would come over our heads and I or my partner would go down to try to apprehend who was doing it. You couldn't see who was doing it. They would vanish into the crowd." He further testified that about 9:25 P.M., "They were saying, 'Let's get them,' and with this they would step off the curb to try to cross 35th Street and we would push them back with force. Once in a while somebody would run out, and we would grab ahold of them and throw them back into the crowd."

About 9:30 P.M. Commander Pierson told Gregory the situation was dangerous and becoming riotous. He asked Gregory if he would co-operate and lead the marchers out of the area. The request to leave the area was made about five times. Pierson then told the marchers that any of them who wished to leave the area would be given a police escort. Three of the marchers accepted the proposal and were escorted out of the area. The remaining demonstrators were arrested and taken away in two police vans.

While we have gone into considerable detail in describing the events leading to the arrest of defendants, only a complete reading of the record can give one a true picture of the dilemma confronting the police. During the entire march from 4:30 P.M. until 9:30 P.M. the marchers were accompanied by their attorney who advised them, and the police were accompanied by an assistant city attorney who advised them. In short the record shows a determined effort by the police to allow the marchers to peacefully demonstrate and at the same time maintain order.

The defendants place heavy reliance on a footnote statement in *Brown* v. *Louisiana*, 383 U.S. 131, 133, 15 L. Ed. 2d 637, 86 S. Ct. 719, that "Participants in an orderly demonstration in a public place are not chargeable with the

danger, unprovoked except by the fact of the constitution-
ally protected demonstration itself, that their critics might
react with disorder or violence;" a statement in *Watson* v.
*City of Memphis,* 373 U.S. 526, 535, 10 L. Ed. 2d 529, 83
S. Ct. 1314, 1320, quoted in *Cox* v. *Louisiana,* 379 U.S.
536, 551, 13 L. Ed. 2d 471, 85 S. Ct. 453, 462, that "The
compelling answer to this contention is that constitutional
rights may not be denied simply because of hostility to
their assertion or exercise;" and a statement in *Wright* v.
*Georgia,* 373 U.S. 284, 293, 10 L. Ed. 2d 349, 83 S. Ct.
1240, 1246, that " * * * the possibility of disorder by
others cannot justify exclusion of persons from a place if
they otherwise have a constitutional right * * * to be
present." They contend that their conduct was peaceful and
that they were charged and convicted solely on the reaction
of the crowd.

The Supreme Court in recent years has had occasion to
reverse a number of breach-of-the-peace convictions based
on civil rights activities. In none of these cases has there
been a public disorder or imminent threat of public dis-
order. *Garner* v. *Louisiana,* 368 U.S. 157, 7 L. Ed. 2d 207,
82 S. Ct. 248, involved sit-ins by Negroes at lunch counters
catering only to whites. The court pointed out, "Although
the manager of Kress' Department Store testified the only
conduct which he considered disruptive was the petitioners'
mere presence at the counter, he did state that he called the
police because he 'feared that some disturbance might
occur.' However, his fear is completely unsubstantiated by
the record." (368 U.S. 157, 171, 7 L. Ed. 2d 207, 218, 82
S. Ct. 248, 255.) *Taylor* v. *Louisiana,* 370 U.S. 154, 8 L.
Ed. 2d 395, 82 S. Ct. 1188, concerned a sit-in by Negroes
in a waiting room at a bus depot, reserved "for whites
only." The court noted, " * * * immediately upon peti-
tioners' entry into the waiting room many of the people
therein became restless and that some onlookers climbed
onto seats to get a better view. Nevertheless, respondent

admits these persons moved on when ordered to do so by the police. There was no evidence of violence." (370 U.S. 154, 155, 8 L. Ed. 2d 395, 396, 82 S. Ct. 1188, 1189.) *Edwards* v. *South Carolina,* 372 U.S. 229, 9 L. Ed. 2d 697, 83 S. Ct. 680, involved a peaceful march by Negroes around the State House. The court commented, "There was no violence or threat of violence on their [marchers] part, or on the part of any member of the crowd watching them. Police protection was 'ample'." (372 U.S. 229, 236, 9 L. Ed. 2d 697, 702, 83 S. Ct. 680, 684.) *Wright* v. *Georgia,* 373 U.S. 284, 10 L. Ed. 2d 349, 83 S. Ct. 1240, concerned 6 Negro boys playing basketball in a public park. The court noted, "The only evidence to support this contention is testimony of one of the police officers that 'The purpose of asking them to leave was to keep down trouble, which looked like to me might start—there were five or six cars driving around the park at the time, white people.' But that officer also stated that this 'was [not] unusual traffic for that time of day.' And the park was 50 acres in area." (373 U.S. 284, 289, 10 L. Ed. 2d 349, 355, 83 S. Ct. 1240, 1245.) *Cox* v. *Louisiana,* 379 U.S. 536, 13 L. Ed. 2d 471, 85 S. Ct. 453, involved the conviction of the leader of some 2,000 Negroes who demonstrated in the vicinity of a courthouse and jail to protest the arrest of fellow demonstrators. The court explained, "There is no indication, however, that any member of the white group threatened violence. * * * As Inspector Trigg testified, they could have handled the crowd." (379 U.S. 536, 550, 13 L. Ed. 2d 471, 481, 85 S. Ct. 453, 462.) Finally *Brown* v. *Louisiana,* 383 U.S. 131, 15 L. Ed. 2d 637, 86 S. Ct. 719, concerned a sit-in by 5 Negroes in the reading room of a public library maintained on a racially segregated basis. The court mentioned, "There was * * * no disorder, no intent to provoke a breach of the peace and no circumstances indicating that a breach might be occasioned by petitioners' actions." (383 U.S. 131, 141, 15 L. Ed. 2d 637, 644, 86 S. Ct. 719, 723.)

The court in two of these cases, *Cox* and *Edwards,* in commenting on the lack of violence or threat of violence remarked that the situations were "a far cry from the situation in *Feiner* v. *New York,* 340 U.S. 315, 95 L. Ed. 295, 71 S. Ct. 303."

In *Feiner* v. *New York,* 340 U.S. 315, 319, 95 L. Ed. 295, 299, 71 S. Ct. 303, 306, defendant was convicted of disorderly conduct when he refused a police order to stop haranguing about 80 "restless" listeners. The court pointed out: "The exercise of the police officers' proper discretionary power to prevent a breach of the peace was thus approved by the trial court and later by two courts on review. The courts below recognized petitioner's right to hold a street meeting at this locality, to make use of loud-speaking equipment in giving his speech, and to make derogatory remarks concerning public officials and the American Legion. They found that the officers in making the arrest were motivated solely by a proper concern for the preservation of order and protection of the general welfare, and that there was no evidence which could lend color to a claim that the acts of the police were a cover for suppression of petitioner's views and opinions." The court concluded, "The findings of the state courts as to the existing situation and the imminence of greater disorder coupled with petitioner's deliberate defiance of the police officers convince us that we should not reverse this conviction in the name of free speech." 340 U.S. 315, 321, 95 L. Ed. 295, 300, 71 S. Ct. 303, 307.

In his dissenting opinion Justice Black stated "The Court's opinion apparently rests on this reasoning: The policeman, under the circumstances detailed, could reasonably conclude that serious fighting or even riot was imminent; therefore he could stop petitioner's speech to prevent a breach of peace; accordingly, it was 'disorderly conduct' for petitioner to continue speaking in disobedience

of the officer's request." (340 U.S. 315, 325, 95 L. Ed. 295, 302, 71 S. Ct. 303, 309.) He then stated the record failed to show any imminent threat of riot or uncontrollable disorder. He next stated "The police of course have power to prevent breaches of the peace. But if, in the name of preserving order, they ever can interfere with a lawful public speaker, they first must make all reasonable efforts to protect him." (340 U.S. 315, 326, 95 L. Ed. 295, 303, 71 S. Ct. 303, 309.) Finally he disagreed with the majority's "statement that petitioner's disregard of the policeman's unexplained request amounted to such 'deliberate defiance' as would justify an arrest or conviction for disorderly conduct. * * * For at least where time allows, courtesy and explanation of commands are basic elements of good official conduct in a democratic society. * * * Petitioner was entitled to know why he should cease doing a lawful act." 340 U.S. 315, 327, 95 L. Ed. 295, 304, 71 S. Ct. 303, 310.

Justice Frankfurter in a concurring opinion summarized the situation this way: "As was said in *Hague v. C.I.O.*, 307 U.S. 496, 83 L. Ed. 1423, 59 S. Ct. 954, *supra,* uncontrolled official suppression of the speaker 'cannot be made a substitute for the duty to maintain order.' 307 U.S. at 516. [59 S. Ct. at 964, 83 L. Ed. 1423.] Where conduct is within the allowable limits of free speech, the police are peace officers for the speaker as well as for his hearers. But the power effectively to preserve order cannot be displaced by giving a speaker complete immunity. * * * *It is not a constitutional principle that, in acting to preserve order, the police must proceed against the crowd, whatever its size and temper, and not against the speaker."* (Emphasis added.) 340 U.S. 273, 288, 95 L. Ed. 271, 279, 71 S. Ct. 328, 336.

Applying the facts of this case to the rationale of the foregoing opinions we believe defendants were not denied

their right to free speech, free assembly and freedom to petition for redress of grievances. First, the record is clear that there was some violence (throwing rocks and eggs) and an imminent threat of extreme public disorder. This immediately distinguishes this case from *Garner, Taylor, Edwards, Cox, Wright* and *Brown* discussed above. In fact the violence and imminent threat of a riot appears to have been greater here than in *Feiner*.

This brings us to the vital issue in the case of whether Justice Frankfurter's appraisal of *Feiner* that "It is not a constitutional principle that, in acting to preserve order, the police must proceed against the crowd, whatever its size and temper, and not against the speaker" can be reconciled with the statement in *Brown* that "Participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence." We think the statements are harmonious when read in light of Justice Black's observation in his dissenting opinion in *Feiner* that "The police of course have power to prevent breaches of the peace. But, if, in the name of preserving order, they ever can interfere with a lawful public speaker, they first must make all reasonable efforts to protect him."

The record before us shows that the police made all reasonable efforts to protect the marchers before asking them to stop the demonstration. While no parade permit had been sought by the group and there had been no direct contact between representatives of the group and the police, the police did know of the planned march and a task force of 44 policemen were assigned to maintain order during the march. The 44 policemen went to Buckingham Fountain in Grant Park at 4:00 P.M. and accompanied the demonstrators while they marched to the city hall for a short demonstration and then marched about 5 miles south to

35th and Lowe. The police kept hostile spectators from interfering with the march around the block bounded by 35th Street, Union Avenue, 36th Street and Lowe Avenue. The taverns in the area were closed, barricades were placed at strategic points, there was radio communication among the police assigned to the area, and spectators were kept across the street. Water sprinklers which were turned on during the demonstration and interfered with the march were removed, persons in doorways were told to get back and close the doors, counterdemonstrators who tried to join the marchers were ordered across the street, a group of 150 countermarchers were ordered out of the demonstrators' line of march, and a pathway was cleared through several hundred spectators when the marchers deviated from their course around the block in which the mayor lived, and spectators who broke police lines and tried "to get" the demonstrators were forcefully thrown back into the crowd. Before the demonstration was ended there were about 100 policemen trying to maintain order in this one block area.

It is evident that there was adequate and determined police protection for the demonstrators from 4 o'clock in the afternoon until 9:30 in the evening while the demonstrators marched from Grant Park to the city hall and then to the mayor's home on the south side of Chicago. The demonstration around the mayor's home lasted 1½ hours during which the police were able to control the hostile crowd. It was between 9:00 and 9:25 that the crowd grew quickly in size and anger to the point where the police felt they could no longer control the situation.

Furthermore, we do not have here an "unexplained request" by the police as was apparently the case in *Feiner*. Commander Pierson told Gregory that the situation was becoming dangerous, that he was having difficulty containing the crowd and that there might be a riot. He asked Gregory five times to lead the marchers out. Gregory then went along

the line of marchers and said "We will not leave; we have not broken any law; we will not resist if we are arrested." Commander Pierson then told the demonstrators that any of them who wished to leave would be given a police escort out of the area. After three of the demonstrators left, the rest were arrested.

We hold that under the circumstances of this case defendants were not denied any right of free speech, free assembly or freedom to petition for redress of grievances.

Defendants also argue that the disorderly conduct ordinance of the city is unconstitutionally vague as applied to free expression and free assembly. We interpret the ordinance as authorizing the action taken by police under the circumstances disclosed by this record. (See *City of Chicago* v. *Williams,* 45 Ill. App. 2d 327.) It does not authorize the police to stop a peaceful demonstration merely because a hostile crowd may not agree with the views of the demonstrators. It is only where there is an imminent threat of violence, the police have made all reasonable efforts to protect the demonstrators, the police have requested that the demonstration be stopped and explained the request, if there be time, and there is a refusal of the police request, that an arrest for an otherwise lawful demonstration may be made. As so interpreted we believe the ordinance is not so overly broad in scope as to be unconstitutionally vague or that it delegates undue discretion to the police. This is the type of conduct with which we are here faced and which is prohibited by the ordinance.

It is also argued that the magistrate committed reversible error by instructing the jury that there was an ordinance requiring a permit for a parade or open air public meeting. A reading of the instructions as a whole convinces us that this instruction would not mislead the jury or prejudice the defendants. The instructions clearly state that defendants were charged with disorderly conduct and the forms of verdict dealt only with disorderly conduct.

The judgments of the circuit court of Cook County are affirmed.

*Judgments affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.