## GREGORY ET AL. *v.* CITY OF CHICAGO.

No. 60.   Argued December 10, 1968.—Decided March 10, 1969.

*Marshall Patner* argued the cause for petitioners. With him on the briefs was *Paul E. Goldstein*.

*Raymond F. Simon* argued the cause for respondent. With him on the brief were *Marvin E. Aspen* and *Howard C. Goldman*.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This is a simple case. Petitioners, accompanied by Chicago police and an assistant city attorney, marched in a peaceful and orderly procession from city hall to the mayor's residence to press their claims for desegregation of the public schools. Having promised to cease singing at 8:30 p. m., the marchers did so. Although petitioners and the other demonstrators continued to march in a completely lawful fashion, the onlookers became unruly as the number of bystanders increased.

Chicago police, to prevent what they regarded as an impending civil disorder, demanded that the demonstrators, upon pain of arrest, disperse. When this command was not obeyed, petitioners were arrested for disorderly conduct.

Petitioners' march, if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment. See *Shuttlesworth* v. *City of Birmingham, post,* p. 147; *Brown* v. *Louisiana,* 383 U. S. 131, 141–142 (1966) (prevailing opinion of MR. JUSTICE FORTAS); *Henry* v. *City of Rock Hill,* 376 U. S. 776 (1964); *Fields* v. *South Carolina,* 375 U. S. 44 (1963), reversing 240 S. C. 366, 126 S. E. 2d 6 (1962). There is no evidence in this record that petitioners' conduct was disorderly. Therefore, under the principle first established in *Thompson* v. *City of Louisville,* 362 U. S. 199 (1960), convictions so totally devoid of evidentiary support violate due process.

The opinion of the Supreme Court of Illinois suggests that petitioners were convicted not for the manner in which they conducted their march but rather for their refusal to disperse when requested to do so by Chicago police. See 39 Ill. 2d 47, 60, 233 N. E. 2d 422, 429 (1968). However reasonable the police request may have been and however laudable the police motives, petitioners were charged and convicted for holding a demonstration, not for a refusal to obey a police officer.* As we said in *Garner* v. *Louisiana,* 368 U. S. 157, 164 (1961): "[I]t is as much a denial of due process to send an accused to prison following conviction for a charge that was never made as it is to convict him upon a charge for which there is no evidence to support that conviction." See also *In re Oliver,* 333 U. S. 257, 273 (1948).

---

*The trial judge charged solely in terms of the Chicago ordinance. Neither the ordinance nor the charge defined disorderly conduct as the refusal to obey a police order.

Finally, since the trial judge's charge permitted the jury to convict for acts clearly entitled to First Amendment protection, *Stromberg* v. *California,* 283 U. S. 359 (1931), independently requires reversal of these convictions.

The judgments are

*Reversed.*

MR. JUSTICE DOUGLAS, while joining the concurring opinion of MR. JUSTICE BLACK, also joins this opinion.

MR. JUSTICE STEWART and MR. JUSTICE WHITE concur in the judgment of the Court and join its opinion insofar as it holds that under the principle established by *Stromberg* v. *California,* 283 U. S. 359, the petitioners' convictions cannot stand.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring.

This I think is a highly important case which requires more detailed consideration than the Court's opinion gives it. It in a way tests the ability of the United States to keep the promises its Constitution makes to the people of the Nation. Among those promises appearing in the Preamble to the Constitution are the statements that the people of the United States ordained this basic charter "in Order to form a more perfect Union, establish Justice, insure domestic Tranquillity . . . and secure the Blessings of Liberty to ourselves and our Posterity . . . ." Shortly after the original Constitution was adopted, again undoubtedly in an attempt to "secure the Blessings of Liberty," the Bill of Rights was added to the Constitution, in which the First Amendment, later made applicable to the States by the Fourteenth Amendment, provides that: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people

peaceably to assemble, and to petition the Government for a redress of grievances."

In 1954 our Court held that laws segregating people on the basis of race or color in the public schools unconstitutionally denied Negroes equal protection of the laws.[1] Negroes, and many others who sympathized with them, cooperatively undertook to speed up desegregation. These groups adopted plans under which they marched on the streets carrying placards, chanting, and singing songs, all designed to publicize their grievances and to petition the various units of government, state and national, for a redress of these grievances. Their activities along these lines quite obviously aroused highly emotional feelings both on their part and on the part of others who opposed the changes in local laws and customs which the "picketers" and "demonstrators" advocated. Agitation between groups brought about sharp conflicts and clashes, threats, fights, riots, and near-riots. This Court, to be sure, has had its difficulties and sharp differences of opinion in deciding the precise boundaries dividing what is constitutionally permissible and impermissible in this field.[2] There have also been sharp disputes over whether the Court can hold laws unconstitutional because the Court deems them to be "unreasonable," "arbitrary," or contrary to fundamental standards of ethics, morals, or conscience.[3] Fortunately, however, these differences need not concern us here. For while we have pointed out in many cases that the States and their subordinate units do have constitu-

---

[1] *Brown* v. *Board of Education,* 347 U. S. 483 (1954).

[2] See, *e. g., Cox* v. *Louisiana,* 379 U. S. 536 (1965); *Adderley* v. *Florida,* 385 U. S. 39 (1966).

[3] See, *e. g., Chambers* v. *Florida,* 309 U. S. 227, 235–236, n. 8 (1940); *Rochin* v. *California,* 342 U. S. 165 (1952); *id.,* at 174 (concurring opinion); *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963).

tional power to regulate picketing, demonstrating, and parading by statutes and ordinances narrowly drawn so as not to abridge the rights of speech, press, assembly, or petition, neither Chicago nor Illinois at the time these petitioners were demonstrating had passed any such narrowly drawn laws.[4]

The facts upon which these arrests and convictions for disorderly conduct occurred were these.

Petitioner Gregory and his group had become dissatisfied because Benjamin Willis, Superintendent of Chicago's public school system, was not moving speedily enough to desegregate the public schools. While Mayor Daley did not appear to have legal authority to remove Dr. Willis,[5] the group evidently believed the Mayor could cause him to be removed if he wanted to do so, and their prodding was therefore directed at the Mayor as well as against Willis. The group march began near the Chicago Loop District at 4:30 p. m. and ended five miles away in the neighborhood of Daley's home. A lieutenant of police, four police sergeants, and about forty

---

[4] The nearest thing to such a law in existence at that time was § 36–31 of the Municipal Code of Chicago, which required written permits for parades on "any public way" or for "any open air public meeting . . . in or upon any public way." Petitioners were neither charged with nor convicted for the offense of failing to obtain a written permit. Indeed, the city clearly gave its effective permission to the marchers by sending a city attorney and a detail of specially trained officers to protect them along every foot of their march. Since "[d]eeply embedded traditional ways of carrying out state policy . . . are often tougher and truer law than the dead words of the written text," *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362, 369 (1940), this march could not be considered illegal in and of itself.

[5] Respondent asserts that under Ill. Rev. Stat., c. 122, § 34–13 (1967), the Superintendent of Schools is accountable solely to the Board of Education and not to the Mayor.

policemen met Gregory at the gathering place in Grant Park. There Gregory addressed the marchers, saying:

"First we will go over to the snake pit [city hall]. When we leave there, we will go out to the snake's house [the mayor's home]. Then, we will continue to go out to Mayor Daley's home until he fires Ben Willis [Superintendent of Schools]."

The demonstrators marched to the city hall, and then they marched to the Mayor's home about five miles away, arriving at about 8 p. m. The demonstrators were accompanied by the police and by the Assistant City Attorney from the park to the Mayor's home. When they reached this neighborhood, the demonstrators began marching around and around near the Mayor's home. Meanwhile the crowd of spectators from the neighborhood kept increasing, and its language and conduct became rougher and tougher. The events leading up to the arrest of the demonstrators are set out in detail in the opinion of the Illinois Supreme Court, and I agree fully with that court's description of these events, which I have reprinted as an appendix to this opinion. This episode finally came to a conclusion at about 9:30 p. m. Fearful that the threatening crowd of onlookers could no longer be contained, the police asked Gregory and his marchers to leave the area. When they refused, they were arrested and charged with violation of Chicago's disorderly conduct ordinance, which provides as follows:

"All persons who shall make, aid, countenance, or assist in making any improper noise, riot, disturbance, breach of the peace, or diversion tending to a breach of the peace, within the limits of the city; all persons who shall collect in bodies or crowds for unlawful purposes, or for any purpose, to the annoyance or disturbance of other persons; . . .

shall be deemed guilty of disorderly conduct, and upon conviction thereof, shall be severally fined not less than one dollar nor more than two hundred dollars for each offense." Municipal Code of Chicago, § 193–1.

I agree with the Illinois Supreme Court that the "record shows a determined effort by the police to allow the marchers to peacefully demonstrate and at the same time maintain order." I also think the record shows that outside of the marching and propagandizing of their views and protests, Gregory and his group while marching did all in their power to maintain order. Indeed, in the face of jeers, insults, and assaults with rocks and eggs, Gregory and his group maintained a decorum that speaks well for their determination simply to tell their side of their grievances and complaints. Even the "snake" and "snake pit" invectives used by Gregory and his demonstrators, unlike some used by their hecklers, remained within the general give-and-take of heated political argument. Thus both police and demonstrators made their best efforts faithfully to discharge their responsibilities as officers and citizens, but they were nevertheless unable to restrain the hostile hecklers within decent and orderly bounds. These facts disclosed by the record point unerringly to one conclusion, namely, that when groups with diametrically opposed, deep-seated views are permitted to air their emotional grievances, side by side, on city streets, tranquility and order cannot be maintained even by the joint efforts of the finest and best officers and of those who desire to be the most law-abiding protestors of their grievances.

It is because of this truth, and a desire both to promote order and to safeguard First Amendment freedoms, that this Court has repeatedly warned States and governmental units that they cannot regulate conduct connected with these freedoms through use of sweeping, dragnet

statutes that may, because of vagueness, jeopardize these freedoms. In those cases, however, we have been careful to point out that the Constitution does not bar enactment of laws regulating conduct, even though connected with speech, press, assembly, and petition, if such laws specifically bar only the conduct deemed obnoxious and are carefully and narrowly aimed at that forbidden conduct.[6] The dilemma revealed by this record is a crying example of a need for some such narrowly drawn law. It is not our duty and indeed not within our power to set out and define with precision just what statutes can be lawfully enacted to deal with situations like the one confronted here by police and protestors, both of whom appear to us to have been conscientiously trying to do their duties as they understood them. Plainly, however, no mandate in our Constitution leaves States and governmental units powerless to pass laws to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots selected by the people either for homes, wherein they can escape the hurly-burly of the outside business and political world, or for public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals.

The disorderly conduct ordinance under which these petitioners were charged and convicted is not, however, a narrowly drawn law, particularly designed to regulate certain kinds of conduct such as marching or picketing or demonstrating along the streets or highways. Nor does it regulate the times or places or manner of carrying on such activities. To the contrary, it might better be described as a meat-ax ordinance, gathering in

---

[6] See, e. g., Thornhill v. Alabama, 310 U. S. 88 (1940); Cantwell v. Connecticut, 310 U. S. 296 (1940); Giboney v. Empire Storage Co., 336 U. S. 490 (1949); Scull v. Virginia, 359 U. S. 344 (1959).

one comprehensive definition of an offense a number of words which have a multiplicity of meanings, some of which would cover activity specifically protected by the First Amendment. The average person charged with its violation is necessarily left uncertain as to what conduct and attitudes of mind would be enough to convict under it. Who, for example, could possibly foresee what kind of noise or protected speech would be held to be "improper"? That, of course, would depend on sensibilities, nerves, tensions, and on countless other things. As pointed out in *Cantwell* v. *Connecticut,* 310 U. S. 296, 308 (1940), common-law breach of peace is at its best a confusing offense that may imperil First Amendment rights. But how infinitely more doubtful and uncertain are the boundaries of an offense including any "diversion tending to a breach of the peace . . ."! Moreover, the ordinance goes on to state that it shall be a crime for persons to "collect in bodies or crowds for unlawful purposes, or for any purpose, to the annoyance or disturbance of other persons . . . ." Such language could authorize conviction simply because the form of the protest displeased some of the onlookers, and of course a conviction on that ground would encroach on First Amendment rights. See *Thornhill* v. *Alabama,* 310 U. S. 88 (1940); *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); *Cox* v. *Louisiana,* 379 U. S. 536 (1965). And it must be remembered that only the tiniest bit of petitioners' conduct could possibly be thought illegal here—that is, what they did after the policeman's order to leave the area. The right "peaceably to assemble, and to petition the Government for a redress of grievances" is specifically protected by the First Amendment. For the entire five-mile march, the walking by petitioners in a group, the language, and the chants and songs were all treated by the city's assistant attorney and its specially detailed policemen as lawful, not lawless, conduct.

The so-called "diversion tending to a breach of the peace" here was limited entirely and exclusively to the fact that when the policeman in charge of the special police detail concluded that the hecklers observing the march were dangerously close to rioting and that the demonstrators and others were likely to be engulfed in that riot, he ordered Gregory and his demonstrators to leave, and Gregory—standing on what he deemed to be his constitutional rights—refused to do so. The "diversion" complained of on the part of Gregory and the other marchers was not any noise they made or annoyance or disturbance of "other persons" they had inflicted. Their guilt of "disorderly conduct" therefore turns out to be their refusal to obey instanter an individual policeman's command to leave the area of the Mayor's home. Since neither the city council nor the state legislature had enacted a narrowly drawn statute forbidding disruptive picketing or demonstrating in a residential neighborhood, the conduct involved here could become "disorderly" only if the policeman's command was a law which the petitioners were bound to obey at their peril. But under our democratic system of government, lawmaking is not entrusted to the moment-to-moment judgment of the policeman on his beat. Laws, that is valid laws, are to be made by representatives chosen to make laws for the future, not by police officers whose duty is to enforce laws already enacted and to make arrests only for conduct already made criminal. One of our proudest boasts is that no man can be convicted of crime for conduct, innocent when engaged in, that is later made criminal. See, e. g., Chambers v. Florida, 309 U. S. 227, 236 (1940). To let a policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than of laws. See Cox v. Louisiana, 379 U. S. 559, 579 (1965)

(separate opinion). There are ample ways to protect the domestic tranquility without subjecting First Amendment freedoms to such a clumsy and unwieldy weapon.

The City of Chicago, recognizing the serious First Amendment problems raised by the disorderly conduct ordinance as it is written, argues that these convictions should nevertheless be affirmed in light of the narrowing construction placed on the ordinance by the Illinois Supreme Court in this case. That court held that the ordinance

> "does not authorize the police to stop a peaceful demonstration merely because a hostile crowd may not agree with the views of the demonstrators. It is only where there is an imminent threat of violence, the police have made all reasonable efforts to protect the demonstrators, the police have requested that the demonstration be stopped and explained the request, if there be time, and there is a refusal of the police request, that an arrest for an otherwise lawful demonstration may be made." 39 Ill. 2d 47, 60, 233 N. E. 2d 422, 429.

This interpretation of the ordinance is, of course, binding on this Court, and the construction of the Illinois Supreme Court is as authoritative as if this limitation were written into the ordinance itself. But this cannot be the end of our problem. The infringement of First Amendment rights will not be cured if the narrowing construction is so unforeseeable that men of common intelligence could not have realized the law's limited scope at the only relevant time, when their acts were committed, cf. *Lanzetta* v. *New Jersey,* 306 U. S. 451, 456–457 (1939), or if the law remains excessively sweeping even as narrowed, *e. g., Winters* v. *New York,* 333 U. S. 507 (1948). Petitioners particularly press the Court to dispose of the case on this latter ground. They raise

troublesome questions concerning the extent to which, even under the narrowed construction, guilt still depends on the mere refusal to obey a policeman's order. And they suggest that the scope of the police obligation to attempt first to deal with the hostile audience is still not made sufficiently clear.

It is not necessary for the Court to resolve such issues in the present case, however, because the Chicago ordinance, as applied here, infringed on First Amendment rights for an even more fundamental reason. Whatever the validity of the Illinois Supreme Court's construction, this was simply not the theory on which these petitioners were convicted. In explaining the elements of the offense to the jury, the trial judge merely read the language of the ordinance. The jury was not asked to find whether, as the Illinois Supreme Court's construction apparently requires, there was "an imminent threat of violence," or whether the police had "made all reasonable efforts to protect the demonstrators." Rather, it was sufficient for the jury to decide that petitioners had made an "improper noise" or a "diversion tending to a breach of the peace," or had "collect[ed] in bodies or crowds for unlawful purposes, or for any purpose, to the annoyance or disturbance of other persons."

In fact, far from taking account of the limiting factors stressed by the Illinois Supreme Court, the judge's charge was based on precisely the opposite theory. The jury was instructed, over petitioners' objection, that "the fact that persons other than these Defendants may or may not have violated any laws or may or may not have been arrested should not be considered by you in determining the guilt or innocence of these Defendants." The significance of this instruction in the context of the evidence at trial is of course apparent—the jury was simply told to ignore questions concerning the acts of violence com-

mitted by the crowd of onlookers and attempts made by the police to arrest those directly responsible for them.[7] Under these circumstances, the principle established by *Stromberg* v. *California*, 283 U. S. 359 (1931), compels us to set aside these convictions. As we explained in *Williams* v. *North Carolina*, 317 U. S. 287, 292 (1942):

> "That is to say, the verdict of the jury for all we know may have been rendered on [an unconstitutional] ground alone, since it did not specify the basis on which it rested. It therefore follows here as in *Stromberg* . . . that if one of the grounds for conviction is invalid under the Federal Constitution, the judgment cannot be sustained."

At the time the petitioners were tried, the Illinois Supreme Court had not yet announced its narrowing construction of the Chicago disorderly conduct ordinance. The trial judge's instructions supplied the jury only with the unadorned language of the statute. Thus it is entirely possible that the jury convicted the petitioners on the ground that Gregory and the others who demonstrated with him had, in the language of the ordinance, "collect[ed] in bodies or crowds . . . to the annoyance or disturbance of other persons," simply because the form of their protest had displeased some of the onlookers. Since the petitioners could not constitutionally be con-

---

[7] The trial judge explained the need for this instruction to counsel, in chambers, as follows:

"[T]he record is replete with evidence that a Jury may well consider to establish the violation of the law on the part of the so-called spectators and neighbors, and the record is silent as to whether any of them were arrested or not.

.     .     .     .     .

"As far as why didn't they arrest these other people, why didn't they arrest the spectators and so on and so on, it seems to me that by virtue of the way the evidence went in, this will be a question that will bother these Jurors unless it is taken care of."

victed on this ground,[8] *Stromberg* compels the reversal of these convictions.[9]

In agreeing to the reversal of these convictions, however, I wish once more to say that I think our Federal Constitution does not render the States powerless to regulate the conduct of demonstrators and picketers, conduct which is more than "speech," more than "press," more than "assembly," and more than "petition," as those terms are used in the First Amendment. Narrowly drawn statutes regulating the conduct of demonstrators and picketers are not impossible to draft. And narrowly drawn statutes regulating these activities are not impossible to pass if the people who elect their legislators want them passed. Passage of such laws, however, like the passage of all other laws, constitutes in the final analysis a choice of policies by the elected representatives of the people.

I, of course, do not mean to say or even to intimate that freedom of speech, press, assembly, or petition can be abridged so long as the First Amendment remains unchanged in our Constitution. But to say that the First Amendment grants those broad rights free from any exercise of governmental power to regulate conduct, as distinguished from speech, press, assembly, or petition, would subject all the people of the Nation to the uncontrollable whim and arrogance of speakers, and writers, and protesters, and grievance bearers. As Mr. Justice Goldberg wrote for the Court in *Cox* v. *Louisiana,* 379 U. S. 536, 554 (1965):

> "The rights of free speech and assembly, while fundamental in our democratic society, still do not

---

[8] See *Thornhill* v. *Alabama,* 310 U. S. 88 (1940); *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); *Cox* v. *Louisiana,* 379 U. S. 536 (1965).

[9] See also *Cole* v. *Arkansas,* 333 U. S. 196 (1948); *Cole* v. *Arkansas,* 338 U. S. 345 (1949).

mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy."

Were the authority of government so trifling as to permit anyone with a complaint to have the vast power to do anything he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical, and religious, would all be wiped out, and become no more than relics of a gone but not forgotten past. Churches would be compelled to welcome into their buildings invaders who came but to scoff and jeer; streets and highways and public buildings would cease to be available for the purposes for which they were constructed and dedicated whenever demonstrators and picketers wanted to use them for their own purposes. And perhaps worse than all other changes, homes, the sacred retreat to which families repair for their privacy and their daily way of living, would have to have their doors thrown open to all who desired to convert the occupants to new views, new morals, and a new way of life. Men and women who hold public office would be compelled, simply because they did hold public office, to lose the comforts and privacy of an unpicketed home. I believe that our Constitution, written for the ages, to endure except as changed in the manner it provides, did not create a government with such monumental weaknesses. Speech and press are, of course, to be free, so that public matters can be discussed with impunity. But picketing and demonstrating can be regulated like other conduct of men. I believe that the homes of men, sometimes the last citadel of the tired, the weary, and the sick, can be protected by

government from noisy, marching, tramping, threatening picketers and demonstrators bent on filling the minds of men, women, and children with fears of the unknown.

For these reasons I concur in the reversal.

### APPENDIX TO OPINION OF BLACK, J., CONCURRING.

#### Excerpt From Opinion of the Supreme Court of Illinois.

"About 4:30 P.M. the marchers, two abreast, walked out of the park and went to the city hall in the loop. The marchers then walked south on State Street to 35th Street and then proceeded west to Lowe Avenue, a distance of about 5 miles from the city hall. The mayor's home is at 3536 South Lowe Avenue. The demonstrators had increased in number to about 85 and they arrived at the mayor's home about 8:00 o'clock P.M. In addition to the police, the marchers were accompanied by their attorney and an assistant city counsel. At the suggestion of an assistant city counsel, Gregory had agreed that the group would quit singing at 8:30 P.M. Commander Pierson, district commander of the 9th police district which encompasses this area, met Lieutenant Hougeson at the corner of 35th and Lowe and assumed command of the police operations.

"There were about 35 people on the corner and a group of about 6 or 8 youngsters carrying a sign 'We Love Mayor Daley' tried to join the marchers but the police stopped them. As the demonstrators started south into the 3500 block of Lowe Avenue, Gregory testified he went back through the line to tell everyone just to keep singing and to keep marching. 'Don't stop and don't answer any one back. Don't worry about anything that is going to be said to you. Just keep marching. If anyone hits you or anything, try to re-

member what they look like, but above all means, do not hit them back. Keep the line straight and keep it tight.' The demonstrators chanted 'Ben Willis must go, Snake Daley, also;' 'Ben Willis must go—When?—Now;' 'We are going to the home of the snake, the snake pit is down the street;' 'Hey, Hey, what do you know, Ben Willis must go' and 'Hey, Hey, what do you know, Mayor Daley must go also.' They carried signs which read: 'Daley fire Willis;' 'Defacto, Desmacto, it is still segregation;' 'Ben Willis must go—now;' and 'Mayor Daley, fire Ben Willis.' They also sang the civil rights songs, 'We Shall Overcome' and 'We Shall Not Be Moved.'

"The police ordered the taverns closed during the march. Police from the task force, the 9th district and other districts surrounded the block in which the mayor's home is located. There were about 10 officers at each of the four intersections and about 10 officers spread along each of the four blocks. The rest of the 100 police officers assigned to the march accompanied the demonstrators as they marched around the block. The police tried to keep all spectators across the street from the marchers. They were equipped with walkie-talkie radios to relay reports of conditions to each other and they had a bullhorn with which they addressed the spectators and the demonstrators.

"As the marchers started around the block the first time, the neighbors began coming out of their homes. On the second time around the block some of the residents had moved their lawn sprinklers onto the sidewalk and the demonstrators went into the street just long enough to get around the water. On the third trip around the block the water sprinklers had been removed, presumably by order of the police. Gregory himself testified to several instances when the police kept the crowd that was accumulating from interfering with the march. 'One of the neighborhood people stood in front of the

line, and we just stopped. This individual didn't move and we didn't move. After a few minutes, the officer standing on the corner asked him to move and he moved.' He said that on their fourth trip around the block (about 8:30 P.M.) people were yelling out the windows and the police made spectators in door ways close the doors. About 8:30 P.M. the demonstrators quit their singing and chanting and marched quietly. Shortly before 9:00 P.M. 100 to 150 spectators formed a line of march ahead of the demonstrators. Gregory said 'the lieutenant [Hougeson] asked me if I would hold up the line until they got those people out of the way. I said, I will hold up the line, but they have just as much right to march peacefully as we have.' The spectators were ordered to move. In order to avoid the appearance that the marchers were following the 100 to 150 spectators who had been ordered to move, Gregory said his group marched straight south crossing 36th Street thus taking them one block south of the block which they had been marching. They had to stop when they crossed 36th Street while the police opened a pathway through about 300 spectators they had confined on the corner across the street.

"Sergeant Golden testified that between 8:00 o'clock and 9:00 o'clock the crowd increased steadily to a few hundred, but that from 9:00 o'clock until about 9:20 o'clock the people just seemed to come from everywhere until it reached between 1,000 and 1,200. During this time the crowd became unruly. There was shouting and threats. 'God damned nigger, get the hell out of here;' 'Get out of here niggers—go back where you belong or we will get you out of here' and 'Get the hell out of here or we will break your blankety-blank head open.' Cars were stopped in the streets with their horns blowing. There were Ku Klux Klan signs and there was singing

of the Alabama Trooper song. Children in the crowd were playing various musical instruments such as a cymbal, trumpet and drum.

"Rocks and eggs were also being thrown at the marchers from the crowd. The police were dodging the rocks and eggs and attempted to catch the persons who threw them. Sergeant Golden explained the problem. 'You could see these teen-agers behind the crowd. You could see a boil of activity and something would come over our heads and I or my partner would go down to try to apprehend who was doing it. You couldn't see who was doing it. They would vanish into the crowd.' He further testified that about 9:25 P.M., 'They were saying, "Let's get them," and with this they would step off the curb to try to cross 35th Street and we would push them back with force. Once in a while somebody would run out, and we would grab ahold of them and throw them back into the crowd.'

"About 9:30 P.M. Commander Pierson told Gregory the situation was dangerous and becoming riotous. He asked Gregory if he would co-operate and lead the marchers out of the area. The request to leave the area was made about five times. Pierson then told the marchers that any of them who wished to leave the area would be given a police escort. Three of the marchers accepted the proposal and were escorted out of the area. The remaining demonstrators were arrested and taken away in two police vans.

"While we have gone into considerable detail in describing the events leading to the arrest of defendants, only a complete reading of the record can give one a true picture of the dilemma confronting the police. During the entire march from 4:30 P.M. until 9:30 P.M. the marchers were accompanied by their attorney who advised them, and the police were accompanied by an as-

sistant city attorney who advised them. In short the record shows a determined effort by the police to allow the marchers to peacefully demonstrate and at the same time maintain order."

MR. JUSTICE HARLAN, concurring in the result.

Two factors in this case run afoul of well-established constitutional principles, and clearly call for reversal. These are the ambulatory sweep of the Chicago disorderly conduct ordinance, see, e. g., *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940), and *Garner* v. *Louisiana*, 368 U. S. 157, 186 (1961) (HARLAN, J., concurring in judgment), and the possibility that as the case went to the jury the convictions may have rested on a constitutionally impermissible ground. See *Stromberg* v. *California*, 283 U. S. 359 (1931).

I agree with the concurring opinion of my Brother BLACK on both of these scores, and to that extent join in it.