MARCUS, Circuit Judge,
specially concurring:
I join fully in the majority’s thoughtful and thorough opinion but write separately to emphasize a few things.
As the majority opinion clearly explains, qualified immunity does not protect government officials from a § 1983 civil rights claim if their conduct violates “clearly established statutory or constitutional rights of which a reasonable person would have known.” Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quotation marks and citation omitted). Where, as here, there is no controlling case law factually on point, “general statements of the law contained within the Constitution, statute, or case law may sometimes provide fair warning of unlawful conduct.” Willingham v. Loughnan, 321 F.3d 1299, 1304 (11th Cir.2003); Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir.2002) (“[T]he words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immuni *1186 ty, even in the total absence of case law”). Thus, “[f]or example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.” Vinyard, 311 F.3d at 1350 (“[I]n the absence of fact-specific case law, the plaintiff may overcome the qualified immunity defense when the preexisting general constitutional rule applies with obvious clarity to the specific conduct in question, and it must have been obvious to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time.”) (quotation marks and citation omitted); see also Hope, 536 U.S. at 743, 122 S.Ct. 2508. Similarly, the reasoning of prior cases may also send “the same message to reasonable officers” in new factual scenarios. Hope, 536 U.S. at 743, 122 S.Ct. 2508; Vinyard, 311 F.3d at 1351 (“[S]ome broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.”).
Under controlling Circuit law we are obliged, as the majority opinion suggests, to apply a heightened pleading standard to a § 1983 civil rights complaint. See discussion infra; see also Danley v. Allen, 540 F.3d 1298, 1313-14 (11th Cir.2008); Swann v. S. Health Partners, Inc., 388 F.3d 834, 838 (11th Cir.2004); Dalrymple v. Reno, 334 F.3d 991, 996 (11th Cir.2003); Cottone v. Jenne, 326 F.3d 1352, 1362 n. 7 (11th Cir.2003). While heightened pleading may not be altogether consonant with the latest Supreme Court law on pleadings, see Leatherman v. Tarrant County N.I.C.U., 507 U.S. 163, 168-69, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (explaining that heightened pleading standards “must be obtained by the process of amending the Federal Rules, and not by judicial interpretation”); Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (rejecting a judicially-created heightened pleading standard for employment discrimination complaints, because “complaints in these cases, as in most others, must satisfy only the simple requirements of Rule 8(a)”), we have no occasion to address the matter today because, even when measured against heightened pleading, the allegations contained in this complaint are more than sufficient, if taken as true, to establish a violation of clearly established constitutional law.
There can be absolutely no doubt that the First Amendment rights to assemble, petition the government for redress of grievances, and speak are among our most fundamental, deeply cherished and clearly established constitutional freedoms. Indeed, long-standing Supreme Court case law interpreting the First Amendment has made it abundantly clear that a municipality or its police department may not intentionally and systematically destroy the ability of individuals or groups to assemble, speak, and distribute literature in a public park. The Supreme Court has put police officers on clear notice for more than half a century that protestors on public property have a First Amendment right to peacefully assemble, express their views, and distribute their literature.
The First Amendment itself expressly provides that “Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.” U.S. Const, amend. I. And, “[i]t has long been established that these First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States.” Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). “It is also well settled that municipal ordinances adopted under state authority constitute state action and are within the pro *1187 hibition of the amendment.” Lovell v. City of Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938).
As far back as 1939, the Supreme Court made it clear that the rights to assemble and distribute literature — two of the primary acts Amnesty sought to undertake on November 20, 2003 at the Torch of Friendship — lie at the heart of the expressive freedoms protected by the First Amendment. Schneider v. New Jersey, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (“Although a municipality may enact regulations in the interest of the public safety, health, welfare, or convenience, these may not abridge the individual liberties secured by the Constitution to those who wish to speak, write, print, or circulate information or opinion.”). In 1943 the Supreme Court again spoke on the subject, reminding us that an ordinance prohibiting leafletting cannot be sustained under the First Amendment, because “one who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word.” Jamison v. Texas, 318 U.S. 413, 416, 63 S.Ct. 669, 87 L.Ed. 869 (1943).
Again, in 1969, the Supreme Court made it abundantly clear that a protest march “if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment.” Gregory v. City of Chicago, 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). Still again, in 1980, the Supreme Court reiterated that a peaceful demonstration, such as the one Amnesty allegedly sought to conduct, is expressive conduct plainly falling within the protections afforded by the First Amendment. Carey v. Brown, 447 U.S. 455, 460, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). Indeed, Carey unequivocally said that the “streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.” Id. (alteration omitted) (quoting Hudgens v. NLRB, 424 U.S. 507, 515, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976)). If there was any lingering question about whether police officers could completely prohibit individuals or groups from assembling, speaking, and distributing literature, the Supreme Court put an end to it in 1983 when the Court decreed that “[tjhere is no doubt that as a general matter peaceful picketing and leaf-letting are expressive activities involving ‘speech’ protected by the First Amendment.” United States v. Grace, 461 U.S. 171, 176, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).
There can be no dispute that Amnesty’s conduct — assembling, demonstrating, and distributing literature — constituted expressive activities squarely protected by the First Amendment. Nor can there be any doubt that the conduct alleged in Amnesty’s complaint utterly and completely eviscerated Amnesty’s ability to participate in such expressive activity. The injury expressly alleged is that the Defendants created a barrier to Amnesty’s speech so great that it effectively denuded Amnesty of any ability to assemble, demonstrate, speak publicly, or distribute its literature in a public park. The Defendants may as well have locked all of Amnesty’s members in a closed room far away from the Torch of Friendship between the hours of 10 a.m. and 2 p.m. on November 20, 2003; if they had been so isolated the members of Amnesty would have had the same opportunity to speak, assemble, and petition as they did from their actual positions on one side or the other of the police cordon allegedly thrown around the Torch of Friendship on November 20, 2003. The allegations detailed in the complaint suggest nothing *1188 less than a complete ban on any meaningful First Amendment activity within the cordoned off park, the precise area where Amnesty was permitted by the police to engage in the exercise of First Amendment activity.
Of course, it is also well-established and long-standing constitutional law that there are circumstances when a reasonable time, place, and manner restriction on demonstrations and leafletting in a public park may be valid under the First Amendment. As the Supreme Court explained in Grace:
“[P]ublic places” historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be “public forums.” In such places, the government’s ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions “are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.” Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest.
461 U.S. at 177, 103 S.Ct. 1702 (internal citations omitted).
But the conduct alleged in this complaint cannot constitute a valid time, place, and manner restriction on Amnesty’s expressive rights. If the complaint is to be believed — and at this stage in the case we are obliged to accept it as true — the police did not set about to enforce a reasonable rule designed to ensure the public’s safety. Rather, the Defendants are said to have effectively and completely closed off Amnesty’s opportunity to speak, assemble, and leaflet in a public park. The police allegedly provided Amnesty with no alternative channel of communication by effectively foreclosing the only venue allowed under the permit. Compare Horton v. City of St. Augustine, 272 F.3d 1318, 1334 (11th Cir.2001); One World One Family Now v. City of Miami Beach, 175 F.3d 1282, 1288 (11th Cir.1999); ISKCON Miami, Inc. v. Metro. Dade County, 147 F.3d 1282, 1290 (11th Cir.1998).
There can be no doubt that it is the long-standing and clearly established law of this nation that the government may not grant a permit to a political group instructing it where and when it may assemble, speak and petition with one hand, and then, at the last moment, completely deny the organization the opportunity to utilize that very permit with the other hand. And there can be no doubt that police conduct knowingly designed to so utterly eviscerate fundamental expressive freedoms would violate clearly established constitutional law.