Roy BROWN et al., Plaintiffs,

v.

William J. SCOTT et al., Defendants.

No. 78 C 1105.

United States District Court,
N. D. Illinois, E. D.

Sept. 27, 1978.

Ellyn A. Hershman, Harvey, Ill., Michael P. Seng, Edward Burke Arnolds, Chicago, Ill., for plaintiffs.

David N. Barkhausen, Chicago, Ill., for William J. Scott.

William R. Quinlan, Robert T. Karmgard, Chicago, Ill., for Bernard Carey and William Craven and Michael Spiocto.

Ellen G. Robinson, Asst. State's Atty., Cook County Ill., Chicago, Ill., for Bernard Carey.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiffs are various members of the Committee Against Racism ("CAR"). On

September 6, 1977, at approximately 6:15 p. m., several of the plaintiffs peacefully demonstrated on the sidewalk in front of Mayor Bilandic's home in order to protest his failure to support busing as a means of achieving racial integration. (Complaint, par. 6). These plaintiffs were arrested for disorderly conduct and for violating the Illinois Residential Picketing Statute. Ill.Rev.Stat. ch. 38, § 21.1–1 et seq. In exchange for dismissal of the disorderly conduct charge, the plaintiffs pled guilty to the charge of unlawful residential picketing. (Complaint, par. 11). Some of these plaintiffs were sentenced to six months supervision, and some were sentenced to one year of supervision. Those subject to the six month supervision have already served their sentences while those subject to the one year of supervision will have completed their sentences on October 18, 1978. (Complaint, par. 12). In addition to the plaintiffs who have been arrested and pled guilty, there are several other members of the Committee Against Racism who have joined as parties plaintiff. One of these, David Smith, participated in the picketing on September 6, 1977, but was not arrested. (Complaint, par. 3(d)). Another member, Joan Raisner, did not participate in the September 6 picketing. (Complaint, par. 3(e)). All of the plaintiffs allege that they wish to picket various Chicago residences and to express their views on racial integration but that the threat of future prosecution under the residential picketing statute has inhibited them. (Complaint, par. 14). More specifically, plaintiffs Buckhoy, Campbell, Brown, Smith and Raisner state in affidavits that the issue of busing to achieve integration has again become topical and that, but for the threat of arrest under the residential picketing statute, they would again picket Mayor Bilandic's home in the same manner and for the same purpose as their September 6 picketing. Plaintiffs seek a judgment declaring that the Illinois Residential Picketing Statute is unconstitutional on its face and as applied, and an injunction against state, county, and city officers prohibiting their enforcement of the statute. Defendants have moved to dismiss the complaint and to deny the injunctive relief. After the preliminary hearing, the parties filed cross motions for summary judgment.

*Preliminary Matters*

At the outset, we believe it advisable to express our understanding of the nature of this case. In our view, plaintiffs are not attempting to collaterally attack or in any way impeach their pleas of guilty before the state court. Although their former arrest and prosecution may be evidence of a likelihood of future arrest for similar conduct, their request for relief is solely prospective in nature, *i. e.,* a declaration that their intended future picketing is protected by the First Amendment against arrest under the Illinois Residential Picketing Statute. With this appreciation of the case, we must quickly reject several of defendants' arguments.

■ Defendant City of Chicago argues that plaintiffs should be collaterally estopped from raising the unconstitutionality of the Illinois Residential Picketing Statute because of their failure to raise that issue in their earlier state criminal proceeding. According to Moore, the doctrine of collateral estoppel applies in the following situation:

> Where there is a second action between parties, . . . who are bound by a judgment rendered in a prior suit, but the second action involves a different claim, cause, or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended.

1B Moore's Federal Practice: ¶ 0.441[2], at 3777 (2d ed. 1974). A critical requirement of the doctrine is that the issue sought to be precluded in the second suit must actually have been litigated in the first suit. According to the complaint, however, the plaintiffs who were prosecuted in the state criminal proceeding never raised the issue of the Illinois statute's constitutionality but rather entered a plea of guilty. In the

former proceeding then, the constitutional issue was not actually litigated, and the doctrine of collateral estoppel therefore cannot be invoked to bar litigation of the constitutional issue in this court.[1]

It is possible that defendant City of Chicago intends to invoke the doctrine of res judicata rather than that of collateral estoppel. Res judicata, however, is equally inapplicable. Under the doctrine of res judicata, a final judgment on the merits in a prior suit between the same parties or their privies bars a second suit based on the same cause of action. 1B Moore's Federal Practice: ¶ 0.405[1], at 622 (2d ed. 1974). Critical to this doctrine is the requirement that the second suit be based on the same cause of action. Although courts have differed over what constitutes the same cause of action, it is clear that plaintiffs' present suit is not on the same cause of action as the prior criminal proceeding. In the prior suit, the cause of action was a criminal prosecution for violation of the Illinois Residential Picketing Statute occurring on September 6, 1977; in the present suit, the cause of action is for a declaratory judgment that a prosecution under the Illinois Residential Picketing Statute for future picketing would be unconstitutional. Although the same issue could be raised in each suit, these suits are clearly not based on the same cause of action. Therefore, res judicata does not bar this suit.

■ Defendant Carey has urged another argument based on the plea of guilty in the prior criminal proceedings. Carey asserts that by pleading guilty, plaintiffs have waived a challenge to the constitutionality of the proceedings in which they were convicted and to the constitutionality of the statute under which they were convicted. *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). This is an accurate statement of the law, but defendant's argument seeks to apply the waiver doctrine beyond its established bounds. A guilty plea operates to waive a constitutional challenge to the statute only for the proceeding in which the plea is entered. Thus, a person who has pleaded guilty may not assert such constitutional infirmities on appeal or by way of collateral review. Pleading guilty and waiving constitutional infirmities in one suit, however, does not waive those same constitutional infirmities in a second, entirely distinct suit. If, for example, the plaintiffs were arrested a second time for violating the residential picketing statute, their plea of guilty in the previous prosecution would not waive their right to challenge the constitutionality of that statute in the second prosecution. The result is no different when the second suit is one for a judgment declaring future conduct protected by the Constitution rather than for prosecution of that future conduct. Thus, plaintiffs' plea of guilty to their criminal prosecution under the Residential Picketing Statute does not waive their right to challenge the constitutionality of this statute as applied to their future picketing.

In addition to the legal reasons outlined above, these defendants' arguments must be rejected for a purely factual reason. Each of the arguments applies only to those plaintiffs who were arrested for violating the picketing statute and who then pleaded guilty to the offense. There are two plaintiffs in this case, David Smith and Joan Raisner, who have never been prosecuted under the statute. As to them, the defendants' arguments clearly have no force.

### Abstention

■ In the landmark cases of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Samuels v. Mackell,* 401 U.S.

---

1. Defendant relies on *Nathan v. Tenna,* 560 F.2d 761 (7th Cir. 1977). In that case the Seventh Circuit held that pleading guilty in a prior criminal proceeding collaterally estopped the pleader from denying the illegality of his conduct in a later civil action for enforcement of a contract. *Nathan,* however, is distinguishable. Unlike *Nathan,* plaintiffs in this case do not seek to litigate an issue already determined in the prior criminal proceeding: their past violation of the residential picketing statute. Rather, they seek to litigate an issue not previously determined: whether plaintiffs' contemplated picketing is protected by the First Amendment against a future prosecution under the Illinois Residential Picketing Statute.

66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), the Supreme Court held that a federal court should abstain from deciding a constitutional issue and granting either injunctive or declaratory relief whenever the constitutional claim may be raised in a pending State criminal proceeding. If, on the other hand, no state criminal proceeding is pending, the federal court need not abstain from issuing a declaratory judgment on the constitutional ground, even in the absence of the requirements for an injunction. *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). According to the complaint, there is no state criminal proceeding pending against any of the plaintiffs.[2] Thus, under the rationale of *Steffel,* we need not abstain from issuing a declaratory judgment in this case.

Defendants argue that *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) has changed the law as enunciated in *Steffel,* quoting the following passage: "Here it is abundantly clear that appellees had an *opportunity* to present their federal claims in the state proceedings. No more is required to invoke *Younger* abstention." 430 U.S. at 337, 97 S.Ct. at 1218 (emphasis in original; footnote omitted). We believe that this passage, when read in context, does not support abstention in the present case. In *Juidice,* the appellees failed to satisfy judgments obtained against them in pending state civil proceedings. Although the appellant state judges issued orders to show cause why appellees should not be held in contempt, appellees failed to respond in any way and failed, in particular, to challenge the constitutionality of the contempt statute. The appellants held the appellees in contempt and imprisoned them. Without challenging the constitutionality of this action in the pending state proceeding, appellees filed a suit in federal court under 42 U.S.C. § 1983, challenging the constitutionality of the contempt statute. In an attempt to avoid the *Younger* abstention requirement, the appellees cited *Gerstein v.*

*Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), a case in which the petitioner was permitted to challenge the legality of his pretrial detention in a federal court suit, despite the pendency of his state criminal prosecution. The *Juidice* Court distinguished *Gerstein* on the ground that since the illegality of pretrial detention could not be raised as a defense to the prosecution and the State court therefore could not try the constitutional issue, the federal court need not abstain from deciding that issue. It was in this context that the *Juidice* Court made its statement that *Younger* may be invoked provided there was an opportunity to present the constitutional issue to the state court. In the statement, the Court merely formulated a distinction between pending state proceedings in which the constitutional question could be raised and pending state proceedings in which the constitutional question could not. But the *Juidice* Court did not alter the threshold requirement for *Younger* abstention: pendency of a state court proceeding. Moreover, the *Juidice* Court did not expand the doctrine of abstention to require that by virtue of having an opportunity to raise a constitutional issue in a concluded state suit, a plaintiff will be precluded by the abstention doctrine from ever raising the same constitutional issue in an entirely distinct federal suit. In *Wooley,* the Court plainly affirmed this implicit conclusion:

> Here, however, the suit is in no way "designed to annul the results of a state trial" since the relief sought is wholly prospective, to preclude further prosecution under a statute alleged to violate appellees' constitutional rights. Maynard has already sustained convictions and has served a sentence of imprisonment for his prior offense. He does not seek to have his record expunged, nor to annul any collateral effects those convictions may have, *e. g.,* upon his driving privileges. The Maynards seek only to be free from prosecutions for future violations of the

---

2. Some of the plaintiffs have not finished serving the sentences imposed in the earlier state prosecution. Although part of a sentence is pending, the prosecution itself has been completed and, for the purposes of *Younger* abstention, is no longer pending. Cf. *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977).

same statutes. *Younger* does not bar federal jurisdiction.

*Wooley v. Maynard,* 430 U.S. 705, 711, 97 S.Ct. 1428, 1433, 51 L.Ed.2d 752 (1977). It scarcely needs repeating that in all those respects which the Court found significant, our case is the same as *Wooley.* The plaintiffs do not seek to collaterally attack their convictions either by annulment or by expunging their criminal records. All they seek is prospective relief against future prosecutions under the same statute. Under these circumstances, we are compelled to conclude that, absent a pending state proceeding, *Younger* abstention is not required.

As a matter of policy, this is also the appropriate result. With the contrary result, for which defendants contend, a person who has failed to raise a potential constitutional claim in a state criminal proceeding but has instead pleaded guilty and served his sentence will forever be precluded from raising that same constitutional challenge in an entirely new cause of action before a federal court. By reaching and barring entirely new causes of action, the effect of defendants' contention would be to infuse abstention with a power which even res judicata does not possess. In addition, the defendants' principle would sap most of the vitality from § 1983, the primary bulwark of citizens' rights against state abuses. Frankly, we do not believe that the doctrine of abstention is intended to have such far-reaching effects. Thus, as a matter of policy as well, we decline to depart from the clear holding of *Wooley.*

## Ripeness of the Case or Controversy

Defendants next assert that plaintiffs' attack on the Illinois Residential Picketing Statute is based on enough future contingencies that it is not ripe for present judicial determination. The test of ripeness has been established for over a generation: "Basically, the question in each case is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The doctrine has encountered its most sophisticated application in the area of First Amendment rights where a failure to find a ripe controversy means that plaintiff can challenge the statute only after his arrest, a result which could likely have a chilling effect on plaintiff's assertion of his alleged rights. In the words of Justice Brennan, "a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974).

There have been several Supreme Court cases in the last decade which offer guidance in determining the degree of ripeness required of a plaintiff seeking to vindicate his First Amendment rights in an action for declaratory judgment. For the most part, these cases have concentrated on two types of conduct which, individually or taken together, indicate a "ripe" controversy: actual prosecution of plaintiffs or threatened prosecution of plaintiffs. In *Boyle v. Landry,* 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971), a group of Negroes challenged the constitutionality of the Illinois statutes prohibiting mob action, resisting arrest, aggravated assault, aggravated battery, and intimidation. According to the complaint, plaintiffs had been either arrested or threatened with arrest for violating one or more of the challenged statutes. *Id.* at 78, 91 S.Ct. 758. A three-judge court upheld all but the mob action and intimidation statutes and found one section of each statute unconstitutionally overbroad. The Supreme Court reversed, holding that the validity of these statutes was not ripe for judicial determination. The Court noted:

Not a single one of the citizens who brought this action had ever been prosecuted, charged, or even arrested under the particular intimidation statute which

the court below held unconstitutional. . . . In fact, the complaint contains no mention of any specific threat by any officer or official of Chicago, Cook County, or the State of Illinois to arrest or prosecute any one or more of the plaintiffs under that statute either one time or many times.

*Id.* at 80–81, 91 S.Ct. at 760. Thus, prosecutions or threats of prosecution under one statute cannot supply the necessary immediacy to create a ripe controversy over the application of another statute under which no prosecutions or threats of prosecution have been made. In another case that term, the Court affirmed that, at a minimum, a genuine threat of prosecution was necessary to establish ripeness:

> But here appellees . . . do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or that a prosecution is remotely possible. They claim the right to bring this suit solely because, in the language of their complaint, they 'feel inhibited.' . . . persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs. . . .

*Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 749, 27 L.Ed.2d 669 (1971). At the other extreme of the ripeness issue is the recent case of *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). In that case, plaintiffs had been arrested, tried, and convicted on three separate occasions for violating the New Hampshire statute which prohibited the covering of any part of an automobile license plate. Following their third state court conviction in less than five weeks, plaintiffs filed a § 1983 action in federal court for declaratory and injunctive relief against future state prosecutions. Given the state record of actual prior prosecution, the Court had little difficulty in finding the controversy ripe. *Id.* at 712, 97 S.Ct. 1428.

Between the extreme of no prior prosecution or no threat of prosecution and that of three successful prosecutions in less than five weeks are a trilogy of Supreme Court cases. In *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), the plaintiffs were challenging, as a denial of due process, the imposition of a state contempt order issued during supplementary proceedings which had been initiated to collect a judgment. All but two of the plaintiffs had been released from jail after payment of their fines. Finding that "the complaint does not allege, and . . . the District Court did not find, that these appellees were threatened with further or repeated proceedings," the Supreme Court held that there no longer existed a live controversy between these plaintiffs and the State of New York. 430 U.S. at 332–33, 97 S.Ct. at 1216. In the converse situation, however, where no actual prosecution had ever been undertaken against the plaintiff, the Supreme Court found that the threats of enforcement were sufficient to create a live controversy. *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). In *Steffel,* a group of Vietnam protestors of which plaintiff was a member had previously been threatened with arrest if they continued handbilling at a shopping center. After the first threat, the group dispersed. On a second occasion, plaintiff and a companion returned to the shopping center and continued handbilling. They were again threatened with arrest. Plaintiff left, but his companion stayed and was subsequently arrested. Plaintiff then brought a § 1983 suit in federal court, seeking declaratory and injunctive relief against future prosecutions for handbilling. At a hearing before the district court, the defendants stipulated that if plaintiff returned to the shopping center and continued handbilling, he would be arrested under the challenged state statute. The Supreme Court held that the threats of prosecution were genuine rather than "imaginary or speculative" and held that although plaintiff had never actually been arrested, "the prosecution of petitioner's handbilling companion is ample demonstration that petitioner's concern with arrest has not been 'chimerical.' " 415 U.S. at 459, 94 S.Ct. at 1215. Under these circumstances, the Supreme Court found a controversy sufficiently ripe to grant declaratory relief.

Unlike *Steffel,* the defendants in our case have not stipulated that plaintiffs would certainly be arrested under the Illinois statute for future picketing. Thus, our case most nearly resembles the third case in the Supreme Court trilogy, *Ellis v. Dyson,* 421 U.S. 426, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975). In that case, plaintiffs were arrested under the Dallas loitering statute. Rather than challenging the constitutionality of the loitering statute in their state prosecution, plaintiffs pleaded nolo contendere and subsequently sought declaratory and injunctive relief in federal court against future state prosecutions. Relying on a Fifth Circuit decision (459 F.2d 919) which was reversed in *Steffel,* the district court denied all relief. The Supreme Court reversed and remanded for the district court "to determine the actual existence of a genuine threat of prosecution, or to inquire into the relationship between the past prosecution and the threat of prosecutions for similar activity in the future." 421 U.S. at 433, 95 S.Ct. at 1695. In dicta, the Court expressed strong doubts about the continuing "liveness" of the controversy for two reasons. First, counsel for the plaintiffs were unaware of plaintiffs' whereabouts and had not heard from them in over a year. Second, the Court was uncertain from the record, whether, under the current pattern of enforcement, plaintiffs would likely be arrested for similar conduct. 421 U.S. at 434, 95 S.Ct. 1691.

■ We believe that the case before us, although a close one, presents a "live" or "ripe" controversy within the meaning of these Supreme Court precedents. In making this determination on a request for declaratory relief, we must assess two probabilities: the likelihood that plaintiffs will engage in allegedly protected conduct, and the likelihood that defendants will arrest plaintiffs under the Illinois Residential Picketing Statute.[3] As to the first factor, the plaintiffs have made a strong and undisputed showing. The plaintiffs have submitted five affidavits averring that because of the Mayor's failure to take a stand on busing since their last picket, plaintiffs strongly desire to picket the Mayor's home at or near the beginning of the school year and to urge him to support publicly the busing of Chicago school children. (Affidavit of Vivian Buckhoy, par. 7; Affidavit of Joan Raisner, par. 4; Affidavit of David Smith, par. 5; Affidavit of Finley Campbell, par. 6; Affidavit of Roy Brown, par. 7). According to the most recent affidavit, the Committee Against Racism, of which all the plaintiffs are members, has formalized this intention in a resolution. The Committee has voted unanimously to picket Mayor Bilandic's house at or near the beginning of the school year, if the threat of arrest under the Illinois statute is removed. (Affidavit of Vicki Campbell, par. 3). Incontrovertibly, these affidavits demonstrate an intent, actually a group commitment, to picket the Mayor's home, and the strength of this intent greatly increases the likelihood that, absent threats of arrest and prosecution, plaintiffs will actually engage in allegedly protected activity during the month of September 1978. It is the manifest presence of this intent which distinguishes our case from that of *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). In *Juidice,* certain of the plaintiffs had been held in contempt for failing to appear at a proceeding in which a judgment against them was sought to be enforced. By the time of the federal trial challenging the constitutionality of the contempt procedures, these plaintiffs had already completed their sentences and paid their fines. There was no allegation of a reasonable likelihood that these plaintiffs would, in the future, refuse to pay their just debts, have judgment entered against them, and then risk contempt by refusing to attend proceedings to enforce that judgment. Understandably, there was also no allegation that these plaintiffs intended to engage in such a

---

**3.** In formulating a framework for analyzing the ripeness of a controversy, Justice Powell emphasized two similar factors. *Ellis v. Dyson,*

421 U.S. 426, 443, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975) (J. Powell, dissenting).

highly contingent course of conduct.[4] With little or no likelihood that these plaintiffs would prospectively be subjected to this allegedly unconstitutional procedure, the Supreme Court found that these plaintiffs' controversy with the state was not "ripe." Here, however, the plaintiffs intend, and their organization has unanimously committed itself, to engage forthwith in the picketing of Mayor Bilandic's home. If there is any lack of "ripeness" in this case, it does not result from the improbability of plaintiffs engaging in allegedly protected activity.[5]

We turn then to the second factor for our consideration, the likelihood of defendants arresting plaintiffs for future picketing of the Mayor's house. Defendants have observed that, unlike *Steffel,* there is no allegation that defendants have threatened to arrest and prosecute plaintiffs under the Illinois Residential Picketing Statute. Although this failure does take our case outside of the precise *Steffel* facts, we do not regard the absence of threatened prosecution as dispositive. In *Ellis v. Dyson,* the Court advised that, in assessing whether there existed a "credible threat" of arrest,[6] the district court may "inquire into the relationship between the past prosecution and the threat of prosecutions for similar activity in the future." 421 U.S. at 433, 95

S.Ct. at 1695. In our case, the relationship between the past prosecution of plaintiffs and their future prosecution is direct and clear. As plaintiffs' affidavits establish, plaintiffs intend to engage in precisely the same conduct as that for which some of them were previously arrested. Plaintiffs in our case are members of the same organization as the prior arrestees; they are seeking to protest the same political issue, the Mayor's failure to support busing; they intend to picket the home of the same public official, Mayor Bilandic; they even intend to picket at the same time of the year, the beginning of school.[7] Clearly, "the challenged statute applied particularly and unambiguously to the activities in which the plaintiff[s] engaged or sought to engage." *Ellis v. Dyson,* 421 U.S. 426, 447, 95 S.Ct. 1691, 1702, 44 L.Ed.2d 274 (1975) (Powell, J., dissenting). By arresting some of plaintiffs under the Illinois Residential Picketing Statute on the prior occasion, the defendants indicated their belief in the constitutionality of the statute. *See* 13 C. Wright, E. Cooper & A. Miller, *Federal Practice and Procedure:* Civil § 3532, p. 255 (1975). In their appearances before this court, the defendants have indicated they persist in this belief. Given the virtually exact similarity between plaintiffs' past and proposed conduct and the defendants' continuing belief in the constitutionality of the

---

**4.** The contingent nature of a future contempt proceeding stems from both the substantial number of events which must occur and the slight probability of the individual events.

**5.** At the hearing on this question, one of defendants' attorneys argued that Mayor Bilandic's refusal to take a stand on busing, the cause for plaintiffs' picketing, is a political decision and that his adherence to this political decision is "purely speculative." Counsel, however, offered no reason why, after 11 months and considerable publicity about the Mayor's busing position, he might reverse his political decision. As far as we are informed, reversal of the Mayor's decision is more a hope than an expectation. Political decisions are notoriously subject to change, and if the mere possibility of change were the test, it is difficult to see how any case of this kind could ever be ripe.

**6.** We think the Supreme Court's "credible threat" of arrest and our "likelihood" of arrest refer to the same factor.

**7.** This high degree of similarity between past and future conduct is one ground for distinguishing *Ellis v. Dyson.* In *Ellis,* plaintiffs were arrested at 2 a. m. in their car and charged with loitering. As their ground for invoking declaratory relief, plaintiffs alleged that their prior arrest had the chilling effect of inhibiting their freedom of movement. *Ellis v. Dyson,* 358 F.Supp. 262, 264 (N.D.Tex.1973). They did not specify what future conduct was inhibited. Thus, it could not be determined whether their future conduct "unambiguously" fell within the statute. 421 U.S. at 447, 95 S.Ct. 1691 (Powell, J., dissenting). Equally important, since the similarity between plaintiffs' past and future conduct could not be determined from the complaint, arrest for plaintiffs' past conduct could not supply any reliable evidence as to the likelihood of arrest for plaintiffs' future conduct.

Illinois Residential Picketing Statute, it appears extremely unlikely that the Chicago police would not use what they regard as a valid law to protect the Mayor against plaintiffs' intended picketing at his home.[8] Thus, there exists a reasonable likelihood, or "credible threat," that defendants would arrest plaintiffs for their intended picketing. Since both factors have been satisfied in this case, we hold that plaintiffs have a "live" controversy with defendants over the constitutionality of the Illinois Residential Picketing Statute.

### The Merits

The Illinois Residential Picketing Statute provides:

It is unlawful to picket before or about the residence or dwelling of any person, except when the residence or dwelling is used as a place of business. However, this Article does not apply to a person peacefully picketing his own residence or dwelling and does not prohibit the peaceful picketing of a place of employment involved in a labor dispute or the place of holding a meeting or assembly on premises commonly used to discuss subjects of general public interest.

Ill.Rev.Stat. ch. 38, § 21.1–2. Plaintiffs have resolved to picket peacefully on the sidewalk in front of Mayor Bilandic's home as a protest against the Mayor's failure to take a public stand in favor of busing, but have failed to undertake their intended picketing because of the probable enforcement of this criminal statute. Picketing, of course, is an activity which often expresses a political or social viewpoint and which is thus entitled to First Amendment protection in many instances. "We have emphasized before this that 'the First and Fourteenth Amendments [do not] afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech," *Shuttlesworth v. Birmingham*, 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969) (citations omitted). Thus, "the conduct which is the subject of this statute—picketing and parading—is subject to regulation even though intertwined with expression and association," *Cox v. Louisiana*, 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965), provided the regulation is reasonable as to time, place, and manner. The defendants argue that the statute's prohibition on picketing a residence is a reasonable regulation on the place where First Amendment activity may occur. Plaintiffs have attacked the statute as void for vagueness, overbroad, and a denial of equal protection.

### Void for Vagueness

Prosecution under a statute may violate due process of law when the statute "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). There are several dangers in such a statute. A vague statute does not provide a person with sufficient warning of the conduct proscribed by the criminal law and may thus lay a trap for the innocent. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). When such a statute implicates conduct which is conceivably protected by the First Amendment, uncertain meanings lead citizens to " 'steer far wider of the unlawful zone' . . .

---

**8.** In determining the "liveness" of a controversy, it is proper and on occasion even necessary to consider the political climate. In *Steffel*, the Court remanded with this instruction: "Since we cannot ignore the recent developments reducing the Nation's involvement in that part of the world [Vietnam], it will be for the District Court on remand to determine if subsequent events have so altered petitioner's desire to engage in handbilling . . . that it can no longer be said that this case presents 'a substantial controversy . . . .' " Of course, the political climate can affect the likelihood of defendants' enforcement as well as the likelihood of plaintiffs' intent to engage in the allegedly protected activity. In our case, for example, it is not insignificant that the residence plaintiffs seek to picket is that of the Mayor rather than that of some citizen whose privacy may be of lesser concern to the Chicago police.

than if the boundaries of the forbidden areas were clearly marked," *Id.* at 109, 92 S.Ct. at 2299, and may thus inhibit citizens from engaging in protected First Amendment activity. In addition, a vague law, by delegating basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, invites arbitrary and discriminatory enforcement. *Id.* at 108–09, 92 S.Ct. 2294. Because of these grave dangers, a person may challenge a criminal statute either as vague on its face or vague as applied. In this case, plaintiffs have challenged phrases in the residential picketing statute on the ground of vagueness.

■ Three of the phrases challenged by plaintiffs define the statute's several exceptions. They are: "residence or dwelling is used as a place of business," "a place of employment involved in a labor dispute," and "the place of holding a meeting or assembly on premises commonly used to discuss subjects of general public interest." Plaintiffs do not contend that the picketing they contemplate will occur at one of the places enumerated in these three exceptions.[9] In a real sense then, there exists no live controversy between plaintiffs and defendants over the application of these exceptions, and plaintiffs lack standing to challenge these exceptions. Despite the clear absence of a live controversy or standing with respect to the statute's exceptions, plaintiffs ask that the exceptions be declared void on their face. Although the preferred position of First Amendment rights may impel a court to entertain a facial challenge at the behest of one who has not been injured by the challenged portions of the statute, a declaration of facial invalidity, even under those circumstances, is "manifestly, strong medicine" and a narrow "exception to our traditional rules of

practice." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). On their face, each of these exceptions reasonably identifies the location where residential picketing may lawfully take place. Although there may be some imaginable instances in which the application of these exceptions, and especially the third, may not be altogether predictable, "the difficulty of determining whether certain marginal cases are within the meaning of . . . a challenged criminal statute does not automatically render that statute unconstitutional for indefiniteness." *United States v. Baranski,* 484 F.2d 556, 562 (7th Cir. 1973) (citations omitted). A declaration of facial invalidity is singularly inappropriate where the residual vagueness giving rise to such marginal cases is susceptible to a limiting construction, 413 U.S. at 613, 93 S.Ct. 2908. When and if a person with standing is prosecuted in one of these marginal cases, the state courts may narrowly construe the exceptions to cure any residual vagueness and thereby prevent an unconstitutional application of the statute. Since the exceptions reasonably identify the locations where residential picketing is permitted and residual vagueness is certainly susceptible to a narrowing construction, we decline to administer the stronger medicine and to declare the exceptions facially void for vagueness.[10]

Plaintiffs also argue that the words "residence or dwelling," "before or about," and "picket" are impermissibly vague. Plaintiffs propose to walk back and forth on the public sidewalk in front of Mayor Bilandic's Bridgeport home, carrying placards which protest his failure to support school busing. As applied to this proposed conduct, the statute is not impermissibly vague. Without much doubt, "picketing" unambiguously

---

9. In their reply brief, plaintiffs raise the possibility that Mayor Bilandic's home is a place "commonly used to discuss subjects of general public interest," but they do not further explain. Consequently, we take this to be another one of the hypotheticals used to illustrate plaintiffs' vagueness arguments.

10. Plaintiffs argue that the proper manner to determine the vagueness of a term or phrase is by posing hypothetical questions. This approach, however, does not accord with the current approach to analyzing vagueness adopted by the Supreme Court or Seventh Circuit. *E. g., Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *United States v. Baranski,* 484 F.2d 556, 562 (7th Cir. 1973).

describes the activity of a person who walks back and forth in front of a building, carrying placards which protest the inhabitant's conduct.[11] Just as unambiguously, "before or about" includes, to someone of common understanding, the sidewalk which runs in front of a house. As for "residence or dwelling," by plaintiffs' own admission, the structure at 3238 South Union is the "residence" of Mayor Bilandic. (Complaint, par. 6). Thus, we believe that a person of ordinary understanding would easily comprehend that the Illinois Residential Picketing Statute clearly applies to plaintiffs' contemplated conduct. The question then becomes whether any of these terms is so vague that the statute should be declared void on its face. We do not think so. "Residence" and "dwelling" are terms regularly used in burglary statutes without resulting in fatal vagueness. *See generally,* Ill.Rev.Stat. ch. 38, § 19–1. On several occasions, the term "residence" has appeared in a statute before the Supreme Court but has not been challenged for vagueness. *E. g., Martin v. Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Breard v. City of Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). Although some nice questions have arisen as to the meaning of "dwelling" and "residence" in the definition of burglary, for example, these terms are easily comprehended by laymen. Neither word unnecessarily leaves arrest or conviction to the subjective judgment of policemen, judges, or juries. The same is true of the word "picketing." Due, in large part, to the publicity attending labor and civil rights activism, the average man has a definite understanding of the type of conduct prohibited by the term "picketing." In legal parlance, the term has achieved a well-established meaning so that judges and juries asked to try a "picketer" will determine the outcome on the basis of explicit standards rather than subjective attitudes. *See generally,* Kamin, *Residential Picketing and the First Amendment,* 61 Nw.U.L.Rev. 167 (1966).

Moreover, we think it not insignificant that, of the many statutes prohibiting "picketing" which have been considered by the Supreme Court, no challenger has ever attempted to argue that the term "picketing" was facially vague. *E. g., Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). Thus, we do not find the term "picketing" void for vagueness. The plaintiffs' third challenge is to the words "before or about." Like the term "near," there is some lack of specificity in this phrase. *Cox v. Louisiana,* 379 U.S. 559, 568, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). This, however, does not render the phrase unconstitutionally vague. In several instances, the Supreme Court has upheld terms denoting proximity against a vagueness attack. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (statute prohibits noisemaking by a person on private or public grounds "adjacent" to a school); *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (statute prohibits picketing or parading "near" a courthouse). *See also, Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). We do not believe that the phrase "before or about" can be distinguished from the terms "adjacent" or "near" on any principled basis. Moreover, we believe that the phrase "before or about" gives fair warning to the person of common understanding at what place his conduct is prohibited. Thus, none of the three terms is facially vague. In so concluding, we do not mean to suggest that there may not be situations in which the application of these terms may be difficult and somewhat unclear. When and if those situations arise, there will be time enough for a state or federal court to determine that the statute is vague as applied and to construe the statute narrowly enough to protect constitutional conduct.

11. Throughout the preliminary hearing, plaintiffs' counsel continually referred to plaintiffs' intended activity as "picketing," and, before we suggested that there might be a vagueness argument about the term, were seeking certification of a class of persons who intended to "picket" on public property in violation of the Illinois Residential Picketing Statute.

*Overbreadth*

In September 1977, several members of the Committee Against Racism were arrested and convicted under the Illinois Residential Picketing Statute for picketing on the sidewalk in front of Mayor Bilandic's home. According to the affidavits submitted on this motion for summary judgment, these Committee members and several of their colleagues intend to picket once again on the sidewalk in front of Mayor Bilandic's home, but they fear renewed prosecution under the Illinois Residential Picketing Statute. Plaintiffs contend that the statute absolutely prohibits them from peacefully picketing on public sidewalks and that it is therefore overbroad as applied. *State v. Schuller,* 280 Md. 305, 372 A.2d 1076 (1977). Defendants respond that the statute is a reasonable regulation of the place where picketing may occur, which is intended to promote the legitimate state interest of protecting the privacy and tranquility of its citizens' homes. *City of Wauwatosa v. King,* 49 Wis.2d 398, 182 N.W.2d 530 (1971).

During the last generation, the Supreme Court has considered several cases "pitting the First Amendment rights of speakers against the privacy rights of those who may be unwilling viewers or auditors" and has developed certain principles for resolving the conflict of these two fundamental interests. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 208, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975).

> A State or municipality may protect individual privacy by enacting reasonable time, place, and manner regulations applicable to all speech irrespective of content. But when the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power. Such selective restrictions have been upheld only when the speaker intrudes on the privacy of the home, or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure.

*Id.* at 209, 95 S.Ct. at 2272 (citations omitted).[12] In essence, a court must look to the nature of the forum at which the plaintiffs propose to picket and then must strike a balance between the First Amendment rights of the speakers and the privacy interests of their audience.

The nature of the sidewalks as a public forum has been an established principle in First Amendment law for over a generation:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. . . . The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, . . .; but it must not, in the guise of regulation, be abridged or denied.

*Hague v. CIO,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Although the public nature of the sidewalks is the paramount and dispositive consideration in many instances where the surrounding area has also been dedicated to public use, Justice Roberts' broad rule has encountered several limitations when the sidewalks are contained within or directly adjoin private property. The Court has clearly held that a state may prohibit, under its trespass laws, all picketing on a sidewalk which is located on an individual's private property or on state property which has not been dedicated to public use. *Lloyd v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972) (owner may constitutionally prohibit handbilling on the sidewalks of shopping center when the subject of the handbilling, Vietnam, is unrelated to the shopping center's use and when the handbillers had adequate

---

**12.** With the possible exception for labor activity discussed under equal protection, the Illinois Residential Picketing Statute is neutral as to content.

alternative means of communicating their protest);[13] *Adderley v. Florida,* 385 U.S. 39, 41, 87 S.Ct. 242, 17 L.Ed.2d 149 (state may constitutionally prohibit picketing on the sidewalks and driveway of the county jail when sidewalks are within the jail compound and have not been dedicated to public use). The Court has also held that, even though the sidewalks surround a state or municipal building which has been dedicated to public use, the state may prohibit certain forms of expressive conduct which interfere with the building's intended use. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (under an anti-noise ordinance, city may constitutionally prohibit a demonstration on the sidewalks adjacent to a school when that demonstration disturbs the peace and good order of the classroom); *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (state may constitutionally prohibit demonstrations on sidewalks near a courthouse when the demonstration is intended to obstruct justice); *see also, Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (city may constitutionally prohibit the use of sound trucks which emit loud and raucous noises on the public streets). In our case, the forum plaintiffs seek to use is the sidewalk in front of the Mayor's residence. This forum does not adjoin a building or area dedicated to public use and hence does not fall within the core of the *Hague* principle. Rather, the sidewalk, admittedly public in nature, borders on property which is incontrovertibly private in nature. *See Garcia v. Gray,* 507 F.2d 539 (10th Cir. 1974). We believe that the sidewalk in this instance falls within the category of fora in which expressive conduct may be prohibited by a narrowly drawn statute if that conduct is inconsistent with the intended use of the surrounding area. Since there exists no absolute right to picket on residential sidewalks, the constitutionality of this statute thus turns on a balancing of the plaintiffs' and defendants' respective interests.

The plaintiffs are seeking to picket in favor of a political viewpoint about one of the most controversial topics in local government: the busing of school children to achieve integrated schools. Without a doubt, plaintiffs' picketing is an expression which is well within the protection of the First Amendment. As a result, plaintiffs' picketing cannot be flatly prohibited at all times and all places. The Illinois statute, however, only prohibits picketing in one particular place, "before or about" a residence, and does not bar picketing at any other appropriate place. During the preliminary hearing, defendants maintained that the Illinois Residential Picketing Statute leaves plaintiffs free to picket the Mayor on the busing issue in an alternative forum, such as City Hall, and plaintiffs did not dispute that this alternative forum exists. It is clear, therefore, that the Illinois statute does not stifle plaintiffs' expressive activity but merely prohibits it in certain places. The question then becomes whether there is something inherent in the residential forum which makes the City Hall forum significantly less meaningful. We do not believe that the City Hall alternative is less meaningful or less reasonable as a forum for plaintiffs' picketing. When faced with a similar choice of alternative fora in *Lloyd,* the Court relied heavily on whether the purpose of the expressive conduct is directly related to the use of the adjoining property. *Lloyd v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); *Garcia v. Gray,* 507 F.2d 539 (10th Cir. 1974). Plaintiffs' purpose in this case is to urge Mayor Bilandic to take a public stand on a controversial political issue. It is difficult to perceive any direct relation between the Mayor's public, political stand and the use of the Mayor's home, and plaintiffs do not appear to argue that such a relation exists. City Hall, on the other hand, is a forum whose

---

13. This case was decided on the theory that the conduct of the shopping center owner was state action under the Fourteenth Amendment theory which was explicitly overruled four years later. *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). *Lloyd,* however, still stands for the principle that a state may protect a citizen from picketing on sidewalks owned by him.

primary uses include the transaction of public business and the decision of controversial political issues; plaintiffs' picketing appears to relate directly to the intended uses of City Hall. In terms of the plaintiffs' purpose then, City Hall is a more meaningful forum than the Mayor's home. There are only two conceivable advantages which the residential forum may offer over City Hall. The plaintiffs feel by picketing the Mayor's home rather than his office, they will obtain greater news coverage for their views. Since the content of plaintiffs' picketing would be the same in either forum, any potentially expanded publicity would appear to result from the perceived inappropriateness of the residential forum and from the potential that the Mayor might respond negatively to the disruption of his home life. *See generally,* Note, *Picketing the Homes of Public Officials,* 34 U.Chi.L. Rev. 106 (1966). A second conceivable advantage is that the picketing of the Mayor's home may make a more forceful impression upon him. This advantage, too, appears to result from the perceived inappropriateness of the residential forum; it may also result from the greater likelihood of intimidation inherent in group patrolling of the family residence. *Id.* Both of these advantages stem from the prohibitable aspects of plaintiffs' conduct, and neither of the advantages is so significant as to make City Hall a substantially less meaningful forum for the legitimate expression of plaintiffs' views. Thus, although plaintiffs have a First Amendment right to picket the Mayor as a protest over his stand on busing, the plaintiffs have in City Hall a reasonable, meaningful, and indeed more appropriate forum for exercising their First Amendment rights and communicating to the Mayor. *Garcia v. Gray,* 507 F.2d 539 (10th Cir. 1974). The existence of an alternative forum, however, is not dispositive of the constitutional question for unless there is a valid and narrowly served state interest

supporting the prohibition, plaintiffs should be free to choose among fora.

Against plaintiffs' First Amendment rights then, we must balance the interests which the Illinois Residential Picketing Statute is intended to serve. The legislative finding clearly identifies the state's interests:

> The Legislature finds and declares that men in a free society have the right to quiet enjoyment of their homes; that the stability of community and family life cannot be maintained unless the right to privacy and a sense of security and peace in the home are respected and encouraged; that residential picketing, however just the cause inspiring it, disrupts home, family and communal life. . . .

Ill.Rev.Stat. ch. 38, § 21.1–1.[14] The state's interest in enacting this statute is to protect the privacy and tranquility of a citizen's home. In First Amendment terminology, the statute attempts to protect a citizen from becoming a captive audience in his own home.

On several occasions, the Supreme Court has considered whether the state's interest in protecting a captive audience outweighs a speaker's interest in communicating his thoughts. In the earliest case posing this conflict, the Supreme Court struck down an ordinance which completely prohibited any person from summoning an occupant to his door for the purpose of distributing handbills or circulars. *Martin v. Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). Sensitive to the homeowner who desired to receive the handbiller's message, the Court reasoned that the unwilling or captive home occupant had within his control a simple and unburdensome means of protecting himself: posting a sign barring solicitors. *Id.* at 147–49, 63 S.Ct. 862. In a subsequent case, the Court struck the balance in favor of the home occupant's privacy, upholding

---

14. Unquestionably, this statute, in its attempt to protect the health and security of its citizens, is a legitimate exercise of the state's police power. *See generally, Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). This is emphatically so, since "the police power of a state extends beyond health, morals and safety, and comprehends the duty, . . . to protect the well-being and tranquility of a community." *Kovacs v. Cooper,* 336 U.S. 77, 83, 69 S.Ct. 448, 451, 93 L.Ed. 513 (1949).

an ordinance which prohibited solicitors from entering the premises of a residence without the occupant's consent. *Breard v. City of Alexandria*, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). Although moved in significant part by the distinction between religious or political and commercial speech, the Court based its holding on the access the solicitors could still maintain through reasonable alternative means of communication. *Id.* at 644, 71 S.Ct. 920.[15] More recently, the Court has again favored the occupant's privacy by upholding a federal statute which permitted a homeowner, who has received mail he believes to be sexually provocative or erotically arousing, to request that the Post Office direct the sender to refrain from future mailings to that homeowner. *Rowan v. United States Post Office Department*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). In some of the Court's strongest language on the subject, the Chief Justice recognized that

> Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit; . . . . The ancient concept that "a man's home is his castle" into which "not even the king may enter" has lost none of its vitality. . . . . That we are often "captives" outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere.

*Id.* at 737–38, 90 S.Ct. at 1490–91; *see also Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); *Collin v. Smith*, 578 F.2d 1197 at 1206 (7th Cir. 1978).

In our case, we also believe that the balance favors the captive homeowner. Without question, home is a unique sanctuary whose benefits are no less numerous or necessary for being intangible. Justice Black has most eloquently underscored

these unique attributes of a person's home. It is "the sacred retreat to which families repair for their privacy and their daily way of living," "sometimes the last citadel of the tired, the weary, and the sick," wherein people "can escape the hurly-burly of the outside business and political world." *Gregory v. City of Chicago*, 394 U.S. 111, 125, 118, 89 S.Ct. 946, 954, 950, 22 L.Ed.2d 134 (1969) (Black, J., concurring). For the person of average means, there is no alternative; home is the final place of retreat. If he is made captive there, he is a captive everywhere. Naturally, the homeowner may be subjected to certain inconveniences, like the sign posting in *Martin*, in order to preserve these characteristics for his home. What is significant in our case, however, is that such simple expedients are not likely to protect the homeowner. Mayor Bilandic may walk out onto his lawn and ask the plaintiffs to cease their picketing, but it would defeat the picketers' avowed purposes if they were to honor such a request. Absent the picketers' voluntary accession to the Mayor's request, the Mayor's only alternative means of protecting his home is through legal prosecution. This, too, may prove ineffective. Since, unlike *Martin*, *Breard*, or *Rowan*, the picketers intend to confine their activity to the public sidewalk, they cannot be prosecuted for trespass. If plaintiffs are peaceful, they cannot be prosecuted for disorderly conduct or breach of the peace. Even if the picketers do cause a disturbance, the breadth of such statutes renders them an uncertain and chinked protection at best. *See Gregory v. City of Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). Moreover, the homeowner is made captive and his tranquility seriously invaded well before he can successfully resort to prosecution under breach of the peace or disorderly conduct statutes.[16] Thus, when the state does not pro-

---

**15.** We have already considered the alternative means of communication available to the plaintiffs in an earlier section of this opinion.

**16.** In some instances, the homeowner may have a tort remedy for nuisance or invasion of privacy. These, too, offer uncertain relief. *See* 34 U.Chi.L.Rev. 106, 127–30 (1966). Perhaps

more to the point, the state should not be confined to the categories of common law torts in defining the kind of activity from which a homeowner may be protected. *See generally, Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (political advertisement need not be misleading). It

tect the homeowner with a residential picketing statute, he does not have an alternative means of protection, either through self-help or through legal process, to which he can easily turn. Compared to the picketers, who have in City Hall a meaningful and easily accessible alternative forum for communication of their views, the homeowner has no alternative means of preserving the privacy of his home. We therefore conclude that the balance favors the privacy interests of the homeowner and against the free speech interests of the picketers.

Plaintiffs contend that although the state may reasonably regulate picketing as to time, place, and manner by means of a narrowly drawn statute, the state may not flatly prohibit picketing in a particular place. The Illinois Residential Picketing Statute, they maintain, is not a statute narrowly tailored to the purposes of the legislature. We do not agree. The purpose of the Illinois legislature in enacting this statute is to preserve the peace and tranquility of a person's home, and "residential picketing," the legislature has found, "however just the cause inspiring it, disrupts home, family and communal life." Ill.Rev. Stat. ch. 38, § 21.1–1. This legislative finding, although general, is a reasonable evaluation of picketing's effects. The nature of picketing, with its persistent marching and patrolling, is inimical to the homeowner's peace of mind and often intimidates the homeowner and his family. An official who, by virtue of his running for office, is willing to confront picketing protestors at his office or at a rally may nonetheless be intimidated by those very same protestors picketing in substantial numbers near his family. By patrolling the official at his home, the picketers are annoying the official and his family and, indeed, are intending to annoy them. The prohibition of all picketing in this location is the only way for the legislature to achieve its purpose of reserving to the homeowner a sense of tranquility, security, and privacy. On this

point, we are in complete agreement with the Supreme Court of Wisconsin:

Tranquility and privacy are fragile enough flowers, particularly in a home setting. . . . Putting aside the not necessarily unreasonable fear of escalation . . . the very fact of physical patrolling and marching by the group of uninvited and unwelcome paraders creates pressure. The newsworthiness of the situation stems in part from the tensions created and pressures focused on the home. Such tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility. If, as we have said, it is a proper public purpose to protect both privacy and tranquility, then the prohibiting of picketing before or about the home is a clearly related and entirely reasonable means to such an end.

*City of Wauwatosa v. King*, 49 Wis.2d 398, 182 N.W.2d 530, 537 (1971). We therefore conclude that the Illinois Residential Picketing Statute, as applied to plaintiffs' intended conduct, is a narrowly drawn measure for achieving the state's purpose of protecting the privacy and tranquility of the home.

Plaintiffs also argue that the Illinois Residential Picketing Statute is overbroad on its face. The Supreme Court has clearly defined the limited occasion on which a court should entertain a facial overbreadth challenge to a statute which is constitutional as applied: "To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973). We have just held that the Illinois statute may legitimately prohibit picketing on the sidewalk in front of Mayor Bilandic's home. Although at the preliminary hear-

is well within the state's police power to protect a captive audience from First Amendment

conduct which has not risen to the level of a tort.

ing, we expressed some misgivings about the breadth of the phrase "before or about" and posed some hypotheticals which illustrated our misgivings, we are not able to conclude that the statute's potential overbreadth is so real and substantial as to justify a holding of facial unconstitutionality. In our view, the statute will most often be applied in the narrow case of picketing on sidewalks in front or alongside of a residence. The possibility of an application to picketers on a neighbor's property or in a public park seems fairly remote. In any event, should one of these possibilities actually eventuate, we are confident that any "real," overbroad application of the statute can be cured by a state or federal court's narrowing construction. *Id.* at 613, 93 S.Ct. 2908. Therefore, we conclude that the Illinois Residential Picketing Statute is not facially overbroad. *See also, Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).[17]

### Equal Protection

As their final argument, plaintiffs assert that the statutory exemption granted to labor picketing violates the Fourteenth Amendment's guarantee of equal protection. The Illinois Residential Picketing Statute provides: "It is unlawful to picket before or about the residence or dwelling of any person, . . . However, this Article does not . . . prohibit the peaceful picketing of a place of employment involved in a labor dispute . . . ." Ill.Rev.Stat. ch. 38, § 21.1–2. Plaintiffs argue that the statute classifies picketing on the basis of its content and that such a classification burdens exercise of the fundamental rights embodied in the First Amendment but is not supported by a compelling state interest. In support of their argument, plaintiffs rely on *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). In *Mosley*, a retired postal worker had peacefully picketed a Chicago high school for seven months, protesting the school's racially discrimina-

ry policies. During this time, the City of Chicago passed a disorderly conduct ordinance which prohibited a person from picketing or demonstrating "on a public way within 150 feet of any primary or secondary school building while the school is in session . . . provided that this subsection does not prohibit the peaceful picketing of any school involved in a labor dispute.'" *Id.* at 93, 92 S.Ct. at 2288. The effect of the ordinance, the Court observed, was to prohibit peaceful picketing which protested the school's racially discriminatory policies but to permit peaceful picketing which protested the school's labor policies. Thus, "the ordinance itself describes impermissible picketing not in terms of time, place, and manner, but in terms of subject matter. The regulation 'thus slip[s] from the neutrality of time, place, and circumstance into a concern about content.' This is never permitted." *Id.* at 99, 92 S.Ct. at 2292; *cf. Young v. American Mini Theatres*, 427 U.S. 50, 65–66, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Finding that the compelling state interest of preventing disruption in the schools did not support the classification made by the ordinance, the Court held the ordinance unconstitutional. *Id.*, 408 U.S. at 102, 92 S.Ct. 2286.

There are two possible classifications which plaintiffs may be attempting to challenge: the classification between picketing a residence and picketing a place of employment and the classification between picketing a place of employment where a labor dispute exists and one where no labor dispute exists. Although the plaintiffs clearly have standing to challenge the first classification, it is distinguishable from *Mosley*. In *Mosley*, both the plaintiff and any labor picketers would be picketing in the same place: within 150 feet of a school. Consequently, the only conceivable difference between the two was in the content of their messages. In our case, on the other hand, the plaintiffs seek to picket at a residence, but they protest the exemption granted cer-

---

17. Unlike the City of Jacksonville in *Erznoznik*, the State of Illinois and City of Chicago admit that the Illinois Residential Picketing Statute

may be susceptible to possible overbroad application.

tain picketers at a place of employment. The classification made by the Illinois statute distinguishes picketing at a residence and picketing at a place of employment. The statute thus regulates on the "neutral" ground of place rather than the impermissible ground of subject matter.[18]

The second classification, between picketing a place of employment involved in a labor dispute and picketing that same place of employment when no labor dispute exists, may well be based on content.[19] Plaintiffs, however, do not claim that Mayor Bilandic's home is a place of employment, and thus, even though the subject of their protest is not a labor dispute, plaintiffs are not members of a class against whom the statute discriminates. Plaintiffs, in other words, lack standing to challenge this second classification. This means that the only avenue of attack left open to plaintiffs is a facial challenge to this classification. Since, as we have said before, the statute's potential unconstitutionality is not substantial in comparison to its plainly legitimate sweep, we decline to declare the entire statute unconstitutional.[20] We therefore conclude that although plaintiffs have standing to challenge the first classification, it is a permissible classification based on place and that even though the second classification may be based on impermissible criterion of content, plaintiffs lack standing to challenge it.

---

18. Of course, a classification which impinges on a fundamental right must still withstand strict scrutiny. This classification, however, is supported by a compelling state interest in providing a meaningful forum for labor protests. Whereas the plaintiffs have in City Hall a meaningful alternative forum for communicating their political views to the Mayor, an employee who works at a residence and who wishes to picket his place of work would be denied a meaningful forum for communicating his views if not for this statutory exception. Thus, since the classification furthers the compelling state interest of furnishing a meaningful forum for certain laborers, we hold that the exception created by the Illinois Residential Picketing Statute does not deny the plaintiffs equal protection of the laws.

19. In *Mosley*, the plaintiff and labor picketers were similarly situated with respect to the time, place, and manner of their picketing. Thus, the only conceivable basis for their different classification was the content of their messages. In our case, on the other hand, plaintiffs and labor picketers are not similarly situated with respect to the place of their picketing. The only plaintiffs who would be similarly situated with respect to time, place, and manner and who would therefore be subjected to a content based classification are persons who seek to picket a place of employment when no labor dispute exists. Yet, even though this second classification can logically be based only on content, it is not invalid *per se* for this reason. *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

20. We agree with the Maryland Appellate Court that this exception is not severable from the rest of the statute. *State v. Schuller*, 280 Md. 305, 372 A.2d 1076, 1083–84 (1977). This also appears to be the way in which the Supreme Court regarded the exception in *Mosley*.