THE STATE OF OHIO, APPELLEE, *v.* NORMAN, APPELLANT.

(No. CA 7474—Decided November 19, 1981.)

*Mr. Terry L. Lewis,* prosecutor, for appellee.

*Gump & Elliott Co., L.P.A.,* and *Mr. Dennis E. Gump,* for appellant.

BROGAN, J. This case comes before this court pursuant to an appeal from a decision of the Vandalia Municipal Court, Vandalia, Ohio, Criminal Division. The defendant-appellant was charged on April 8, 1980, by a complaint filed in Vandalia Municipal Court, for an alleged violation of R.C. 4737.01. Prior to trial, a motion to dismiss with supportive memorandum was filed on July 7, 1980, which was overruled by the trial court.

At the scheduled trial stipulations were entered and filed on August 29, 1980, which stipulations state:

"1. The defendant, Robert Norman, lives at 4328 Catalpa Dr., Harrison Township, Montgomery County, State of Ohio.

"2. On April 8, 1980 said Robert Norman was a person/dealer who buys and sells gold and silver, coins, scrap gold and silver, diamonds, jewelry and stamps at the above stated address.

"3. On April 8, 1980, Deputy W. Bartlett a duly authorized law enforcement officer of the Montgomery County Sheriffs' Department went to the home of said Robert Norman and requested to inspect his records with regards to the above stated items which Mr. Norman purchases, sells, exchanges or receives.

"4. Robert Norman, on the above stated date, refused to comply with Deputy Bartlett's request.

"5. Deputy W. Bartlett had not requested nor was in possession of a search warrant.

"6. Exhibit A attached hereto is a telephone book advertisement requested by said Robert Norman under coin dealers dated June 14, 1979."

On September 16, 1980, the trial court found the defendant guilty and on July 16, 1981 imposed a $500 fine and costs. From the judgment and sentence of July 16, 1981 defendant-appellant filed a timely appeal.

Appellant contends the motion to dismiss and the memorandum in support of motion to dismiss should have been sustained in that the statute is unconstitutional on its face and the statute is unconstitutional as applied to the facts and stipulations of the case.

The assignments of error are rather ineptly drawn but we will refer to the motion to dismiss filed in the trial court and infer that counsel assigns as error the trial court's refusal to dismiss the complaint for the reason R.C. 4737.01 is unconstitutional in that it is "void for vagueness" and "overbroad."

Appellant contends that he should not be prosecuted under R.C. 4737.01 in that he could not reasonably understand or anticipate that he was a purchaser and seller of gold and silver, coins, scrap gold and silver, diamonds, jewelry and stamps and would fall within the parameters of this statute.

R.C. 4737.01 reads:

"(A) A person purchasing, selling, exchanging, or receiving *secondhand articles of any kind,* scrap iron, old metal, canvas, rope, branded bottles, junk, or lead pipe, except plow irons, old stoves, and furniture, shall post in a conspicuous place in or upon his shop, store, wagon, boat, *or other place of business,* a sign having his name and occupation legibly inscribed thereon, and keep a separate book, open to inspection by any law enforcement officer, in which shall be written, in the English language, at the time of the purchase or exchange of such articles, a description thereof, the name, description, and residence of the person from whom purchased and received, and the day and hour when such purchase or exchange was made. Every entry shall be numbered consecutively, commencing with number one.

"(B) Any person, prior to purchasing any secondhand article of furniture or secondhand electrical or gas appliance or equipment for the purpose of resale to the general public, shall demand to examine the seller's driver's license or identification card issued under sections 4507.50 to 4507.52 of the Revised Code and one additional type of card typically used for identification purposes.

"The purchaser shall keep a written record of the number of the license or identification card and the type and number of the other identification card accepted together with the date of purchase, the name and address of the seller, and a description of the article purchased. The purchaser shall retain the written

record for at least one year and shall make the record available for inspection by any law enforcement officer at all reasonable times. For the purposes of this division, the purchaser may utilize the written record he is required to keep where applicable under division (A) of this section and add to it the information required by this division." (Emphasis added.)

Appellant contends the terms "secondhand articles of any kind" and "old metal" are constitutionally too vague to be understood by a person of ordinary intelligence to give fair notice that his contemplated conduct is forbidden by the law. In addition, he contends the statute is unconstitutional because it is overbroad in that it sweeps into its net persons who have no intent to commit any crime, *i.e.*, persons who believe they are performing lawful activities.

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. *Grayned* v. *City of Rockford* (1972), 408 U.S. 104, 108.

Vague laws may trap the innocent by not providing fair warning. *Papachristou* v. *City of Jacksonville* (1972), 405 U.S. 156. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. *Coates* v. *City of Cincinnati* (1971), 402 U.S. 611 [58 O.O.2d 481]; *Gregory* v. *Chicago* (1969), 394 U.S. 111. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. *Edwards* v. *South Carolina* (1963), 372 U.S. 229.

Condemned to the use of words, we can never expect mathematical certainty from our language. It will always be true that fertile legal "imagination can conjure up hypothetical cases in which the meaning of * * * [disputed] terms will be in nice question." *American Communications Assn.* v. *Douds* (1950), 339 U.S. 382, 412.

When the vice of a statute is its vagueness, the litigant asserting the vagueness defense must demonstrate that the statute in question is vague as applied to the litigant's conduct without regard to its potentially vague application to others. *Parker* v. *Levy* (1974), 417 U.S. 733. "A *'perfectly vague'* statute is one which provides 'no ascertainable standard for inclusion or exclusion' and thus is vague in all its applications. See, *e.g. Coates* v. *City of Cincinnati*, 402 U.S. ̇611, 614 (1971); *Smith* v. *Goguen*, 415 U.S. 566, 578 (1974). The ordinance in *Coates* v. *City of Cincinnati*, 402 U.S. 611 (1971), made it illegal for 'three or more persons to assemble [on] any sidewalk [and] there conduct themselves in a manner annoying to persons passing by.' *Id.* at 611-12. The 'annoying' criterion is not vague merely in the sense that it is an imprecise but comprehensible normative ̇standard; it specifies *no standard at all* because one may *never* know in advance what 'annoys some people [but] does not annoy others.' *Id.* at 614. Being 'perfectly' vague, the ordinance in *Coates* is vague in all its applications and does not present a problem of third-party standing." Tribe, American Constitutional Law (1978), at pages 720-721. (Emphasis *sic*.)

As a matter of due process, a law is void on its face if it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally* v. *General Construction Co.* (1926), 269 U.S. 385, 391.

*Lanzetta* v. *New Jersey* (1939), 306 U.S. 451, involved a New Jersey statute of the type that seeks to control vagrancy. "These statutes are in a class by

themselves, in view of the familiar abuses to which they are put * * *. Definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of police and prosecution, although not chargeable with any particular offense. In short, these 'vagrancy statutes' and laws against 'gangs' are not fenced in by the text of the statute or by the subject matter so as to give notice of conduct to be avoided." Mr. Justice Frankfurter's dissent in *Winters* v. *New York* (1948), 333 U.S. 507, at page 540.

In the First Amendment area, the objectionable aspects of vagueness need not depend upon the absence of fair notice, for the First Amendment's demand for specificity is also a product of the concern for a statute's chilling effect. "Those * * * sensitive to the perils posed by * * * indefinite language * * * avoid the risk * * * only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited." *Baggett* v. *Bullitt* (1964), 377 U.S. 360, 372. As a consequence, the Supreme Court requires more specificity of a statute potentially applicable to expression sheltered by the First Amendment than in other contexts. *Smith* v. *Goguen* (1974), 415 U.S. 566.

In *Columbus* v. *Thompson* (1971), 25 Ohio St. 2d 26 [54 O.O.2d 162], the Supreme Court of Ohio dealt with a "suspicious" person ordinance and found it void for vagueness. The court said:

" 'The problem with suspicion is that it is a subjective term incapable of providing any intelligible standard to guide either suspect or court. The absence of limiting standards leaves the citizen at the "mercy of the officers" whim or caprice.' " 25 Ohio St. 2d at 32.

See, also, Annotations at 25 A.L.R. 3d 792 and 836, which deal with the validity of vagrancy and loitering statutes and ordinances; and *Dayton* v. *Allen* (C.P. 1971), 28 Ohio Misc. 181 [56 O.O.2d 366].

Is the term "secondhand articles of any kind" so imprecise that a person of ordinary intelligence would have to guess at its meaning? We think not. Certainly it does not suffer from the same imprecision that words "annoying," "contemptuous conduct," "loitering," or "gang" convey. In addition, the title heading for R.C. Chapter 4737 includes the term "secondhand dealers," a clear indication to the public and law enforcement officials that it is only to those in the business of purchasing and selling secondhand articles that the statutory requirements pertain. Indeed, the statutory requirement that a sign be posted in the "shop, store, wagon, boat, or *other place of business*" indicates its applicability only to dealers. (R.C. 4737.01[A]; emphasis added.) This would seem to clearly address itself to the "overbroad" argument of the appellant. The statute can be clearly understood as not to apply to an occasional sale of a secondhand article or to "garage sales" by homeowners.

Indeed, the purpose of the legislation in question was addressed in *Phillips* v. *State* (1907), 77 Ohio St. 215. The court in *Phillips,* at page 217, stated:

"The business of dealing in secondhand articles and junk is one which is peculiarly liable to abuse; and, whether honestly conducted or not, experience has shown that stolen or lost property frequently finds its way to the junk dealer, through the agency of the persons who have unlawfully appropriated it. In view of the fact that it frequently happens that individuals seeking to reclaim their property are suddenly stopped and forever baffled at the door of the junk dealer's shop, the requirements complained of here seem to us to be very fair and moderate."

Crime has increased in almost geometrical proportions since the original passage of this legislation and the merit of such legislation is not to be seriously questioned. Indeed, the radical rise in value of gold, silver, silverware, make them popular items for thieves to sell to secondhand dealers. To require that records of

such purchases be available for reasonable inspection by law enforcement authorities is clearly a reasonable regulation in the public interest.

If the term "secondhand articles of any kind" is not vague or imprecise, does its presence in a statute in the company of other terms such as, scrap iron, old metal, canvas, rope, branded bottles, junk, or lead pipe, mislead the public into believing coins, gold, silver, silverware, were not to be considered within the purview of the statute? It must be remembered that the section at least as titled was to regulate secondhand dealers *and* junk dealers. Thus some items specified might have applications to items commonly seen in junkyards and the others in the hands of secondhand dealers. Indeed, to specify all possible items purchased secondhand would take the prolixity of a telephone book or dictionary.

A settled principle of statutory construction is that words in a statute are to be given their plain and ordinary meaning unless it is otherwise clearly indicated. *Crane* v. *Commr. of Internal Revenue* (1947), 331 U.S. 1, 6; *Lake County Nat. Bank* v. *Kosydar* (1973), 36 Ohio St. 2d 189 [65 O.O.2d 404]. Appellant stipulated he was a person/dealer who buys and sells gold and silver, coins, scrap gold and silver, diamonds, jewelry and stamps. (Stipulation 2.) He can hardly contend he is not purchasing and selling secondhand articles.

An examination of the stipulations which were the entire evidence submitted by the state of Ohio indicates appellant was convicted of a violation of R.C. 4737.01 for refusing to permit Deputy Bartlett to "inspect" the records of appellant required by R.C. 4737.01.

The stipulations indicate Deputy Bartlett was not in possession of a search warrant when he requested to inspect appellant's records. Appellant contends the statutory requirement of keeping a separate book for inspection under R.C. 4737.01 violates the Fourth Amendment

to the United States Constitution and therefore the statute must be determined by the court as unconstitutional.

Administrative inspections are subject to the governing principle that "a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara* v. *Municipal Court* (1967), 387 U.S. 523, 529. Nevertheless, when this principle was announced the Supreme Court reserved comment on inspections of businesses in highly regulated industries:

"We do not in any way imply that business premises may not reasonably be inspected in many more situations than private homes, nor do we question such accepted regulatory techniques as licensing programs which require inspections prior to operating a business or marketing a product.

"Any constitutional challenge to such programs can only be resolved * * * on a case-by-case basis under the general Fourth Amendment standard of reasonableness." *See* v. *Seattle* (1967), 387 U.S. 541, 545-546.

This language served as a basis for two Supreme Court decisions that defined an exception to the *Camara-See* rule. In *Colonnade Catering Corp.* v. *United States* (1970), 397 U.S. 72, and *United States* v. *Biswell* (1972), 406 U.S. 311, the court held that the warrant requirement is not applicable to strictly regulated or licensed businesses when Congress has determined that the search is necessary to carry out a regulatory scheme and has given specific statutory authorization for the search. These two decisions had the effect of holding businesses in certain heavily regulated industries to a type of constructive consent to warrantless administrative searches as a prerequisite to doing business in that industry.

In *Biswell* a United States Treasury agent inspected defendant's pawnshop pursuant to an inspection procedure authorized by the Gun Control Act of

1968. The agent presented proper identification, looked over defendant's books, and asked for permission to inspect a locked storeroom. The defendant asked for a search warrant, and the agent responded by showing him the provisions of the statute that authorized inspection. The dealer read the statute and then unlocked the storeroom where the agent found evidence that led to defendant's conviction for the unlicensed possession of two sawed-off rifles. The court of appeals overturned the conviction, holding the Act unconstitutional, but the Supreme Court reversed and reinstated the conviction. 406 U.S. at 313.

The court held that the entry in *Biswell* was valid because it was not forcible and was made under lawful authority. The statutory scheme was upheld on the basis that unannounced inspections were to be effective and serve as a credible deterrent to violation of the laws relating to the control of firearms. The defendant's challenge that he had involuntarily consented to the search was rejected as inapposite. The court drew an analogy between one who voluntarily submits to a lawful, statutorily authorized regulatory inspection and one who acquiesces in a search of his dwelling authorized by a valid warrant. In both cases, said the court, the person accepts the mandate of legal process rather than face criminal sanctions. The legality of a search that is carefully regulated by statute, therefore, depends upon the authority of valid legislation and not on consent. The court further reasoned that when a businessman chooses to deal in a heavily regulated industry and accept a federal license, he is held informed of the necessity, expectability, and limits of governmental inspections. Under such regulatory statutes, the dealer's right to privacy is not unjustifiably interfered with by inspections performed without a warrant.

The court's analysis in *Biswell* was not, however, limited to businesses with long histories of governmental regulation. Instead, the court announced an exception to the *Camara-See* rule that included all regulatory searches that furthered urgent federal interests: "We have little difficulty in concluding that where, as here, regulatory inspections further urgent federal interests, and the possibilities of abuse and the threat to privacy are not of impressive dimensions, the inspection may proceed without a warrant where specifically authorized by statute." *Id.* at 317.

Several post-*Biswell* cases led to its expansion in the lower courts to include unlicensed but regulated industries. *Youghiogheny & Ohio Coal Co. v. Morton* (S.D. Ohio 1973), 364 F. Supp. 45 [70 O.O.2d 26]; *United States v. Montrom* (E.D. Pa. 1972), 345 F. Supp. 1337. Such expansion was nevertheless consistent with *Biswell's* majority's reasoning that the exception to the *Camara-See* rule included all regulatory searches that furthered federal interests. These cases involved the unlicensed but heavily regulated coal industry.

In *Youghiogheny* the court upheld the constitutionality of provisions in the Federal Coal Mine Health and Safety Act of 1969 that directed and required the Secretary of the Interior and his authorized representatives to make warrantless searches of coal mines. The court noted that the coal industry had long been held subject to Congress' powers under the Commerce Clause and that businesses in this pervasively regulated industry appeared to have consented, "by implication at least, to reasonable intrusions by federal authorities." 364 F. Supp. at 49, 50. Whether the inspection scheme was constitutional depended upon "whether warrantless searches, in the context of mine safety investigations, are reasonable." *Id.* at 50. Reasonableness was determined by (1) "whether the government had a valid and important interest in this area," *id.*, (2) whether resort to a magistrate for a warrant would frustrate

attainment of the statute's goals, (3) whether the coal mine owner had a reasonable expectation of privacy, and (4) whether a grave danger of abuse was created by allowing warrantless entry. The court found the investigative scheme reasonable under these criteria and accordingly held permissible the legislative determination "* * * that probable cause or exigent circumstances exist in the coal industry so as to make warrantless searching of its mines reasonable. * * * In the Fourth Amendment area, where the essence of the right hinges on a concept of reasonableness, the Congressional definition is entitled to great weight. In the case at bar * * * we refuse to second guess its determination." *Id.* at 52.

In *G.M. Leasing Corp.* v. *United States* (1977), 429 U.S. 338, the court again reaffirmed the *Camara-See* principle. The court acknowledged that "a business, by its special nature and voluntary existence, may open itself to intrusions that would not be permissible in a purely private context." *Id.* at 353. In this case, however, the intrusion was not based on the nature of petitioner's business, its license or any specific regulation of its activities. *Id.* at 354.

In *Camara* the Supreme Court expressed concern about possible abuses of the power to conduct warrantless searches. It noted the function a magistrate plays in delimiting the scope of a search:

"Under the present system [of unannounced warrantless entries by housing code inspectors], when the inspector demands entry, the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization." *Id.* at 532.

This concern about abuse explains the third criterion that must be satisfied before a warrantless inspection scheme

fits within the *Colonnade-Biswell* exception. The inspection must be conducted in accordance with a statutorily authorized procedure that carefully limits time, place, and scope in order to guard against possible abuse of an inspection right.

The most important consideration is the language of the statute, as noted in *Biswell*: "In the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute." *Id.* at 315. The warrantless inspections authorized by the Gun Control Act of 1968 and upheld in *Biswell* were statutorily limited to the dealer's business hours, his premises (including places of storage), and to required records or documents and firearms or ammunition kept or stored there. In addition to these limitations, the court pointed out that each licensed dealer is given a compilation of ordinances describing his obligations and the inspector's authority so that "[t]he dealer is not left to wonder about the purposes of the inspector or the limits of his task." *Id.* at 316.

We note that secondhand dealers, junk dealers, and pawnbrokers have been regulated for many years in Ohio. As indicated in *Phillips,* much of the concern has been that persons operating in these occupations often become conduits for stolen property. The search permitted under R.C. 4737.01 is carefully limited to inspection of a book listing transactions and is not a *carte blanche* authority to search the premises of the dealer. It unquestionably is conducted to further legitimate state interests.

Thus, we find that an inspection under R.C. 4737.01 without a warrant would not be "unreasonable." We find R.C. 4737.01 is not constitutionally infirm for violation of the Fourth Amendment.

We find R.C. 4737.01 is neither unconstitutional on its face nor as applied to the facts and stipulations of this case. The

judgment and sentence of the trial court is affirmed.

*Judgment affirmed.*

PHILLIPS and WILSON, JJ., concur.